UNITED STATES OF AMERICA

IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEMO USA, WLL (QATAR),

  Plaintiff,

v.                                                    Case No. 18-cv-10674

LXR BIOTECH, LLC, LXR                Hon. Sean F. Cox
DISTRIBUTING, LLC, ETERNAL      Magistrate Judge Elizabeth A. Stafford
ENERGY, LLC, LXR BIOTECH
CORPORATION, LXR
DISTRIBUTION CORPORATION,
ANDREW KRAUSE,
And JOHN AND JANE DOES,

  Defendants.
_____

| | |
|---|---|
| McDONALD TINKER PA<br>By:  Corey M. Adams, #27253<br>300 W. Douglas, Suite 500<br>Wichita, KS  67202<br>cadams@mcdonaldtinker.com | OTTENWESS TAWEEL &<br>SCHENK PLC<br>By:  Thomas P. Bruetsch (P57473)<br>535 Griswold, Suite 850<br>Detroit, Michigan  48226<br>TBruetsch@OttenwessLaw.com |
| SILVERMAN & MORRIS PLLC<br>By:  Thomas R. Morris (P39141)<br>32300 Northwestern Highway, Suite 215<br>Farmington Hills, MI  48334<br>morris@silvermanmorris.com | LAW OFFICE OF JOHN M.<br>KETZLER PLLC<br>By:  John M. Ketzler (P53044)<br>4237 North Atlantic Blvd.<br>Auburn Hills, Michigan  48326<br>johnketzler@jketzlerlaw.com |
| Attorneys for Plaintiff | Attorneys for Defendants |

_____

**<u>DEFENDANTS' MOTION TO AMEND AFFIRMATIVE DEFENSES</u>**

1

Defendants move for an order allowing them to amend their affirmative defenses to add as affirmative defenses: (1) that terms of the agreements among the parties were waived and that Plaintiff is estopped from enforcing the agreements as written; and (2) that the loaning of money by Plaintiff, a non-financial institution, for interest,  is illegal in its country of incorporation, and that Plaintiff did not have the authority to lend money for interest, and thus the promissory notes are illegal, the Plaintiff's agreements *ultra vires,* and the promissory notes and related agreements are void under public policy.

 Defendants certify that, in accordance with L.R. 7.1, their counsel conferred with Plaintiff's counsel on January 9, 2019, explained the nature of the motion, and requested counsel to stipulate in the relief sought in this motion, and that Plaintiff's counsel declined to so stipulate.

In further support of their motion, Defendants rely on the attached brief.

Respectfully Submitted,

OTTENWESS, TAWEEL & SCHENK PLC

By:   /s/Thomas P. Bruetsch
Thomas P. Bruetsch (P57473)
535 Griswold, Suite 850
Detroit, Michigan  48226
(313) 965-2121
TBruetsch@OttenwessLaw.com

Dated:  January 15, 2019

2

UNITED STATES OF AMERICA

IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEMO USA, WLL (QATAR),

    Plaintiff,

v.

LXR BIOTECH, LLC, LXR
DISTRIBUTING, LLC, ETERNAL
ENERGY, LLC, LXR BIOTECH
CORPORATION, LXR
DISTRIBUTION CORPORATION,
ANDREW KRAUSE,
And JOHN AND JANE DOES,

    Defendants.

Case No. 18-cv-10674

Hon. Sean F. Cox
Magistrate Judge Elizabeth A. Stafford

_____

McDONALD TINKER PA
By:  Corey M. Adams, #27253
300 W. Douglas, Suite 500
Wichita, KS  67202
cadams@mcdonaldtinker.com

SILVERMAN & MORRIS PLLC
By:  Thomas R. Morris (P39141)
32300 Northwestern Highway,
Suite 215
Farmington Hills, MI  48334
morris@silvermanmorris.com

Attorneys for Plaintiff

OTTENWESS TAWEEL & SCHENK
PLC
By:  Thomas P. Bruetsch (P57473)
535 Griswold, Suite 850
Detroit, Michigan  48226
TBruetsch@OttenwessLaw.com

LAW OFFICE OF JOHN M.
KETZLER PLLC
By:  John M. Ketzler (P53044)
4237 North Atlantic Blvd.
Auburn Hills, Michigan  48326
johnketzler@jketzlerlaw.com

Attorneys for Defendants

_____

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO AMEND AFFIRMATIVE DEFENSES

# **TABLE OF CONTENTS**

**PAGE**

MOST RELEVANT OR CONTROLLING AUTHORITIES .......................... 5

INDEX OF AUTHORITIES ............................................................. 5

ISSUE PRESENTED ..................................................................... 6

BACKGROUND ......................................................................... 7

ARGUMENT ............................................................................. 8

    I.   DEFENDANT SHOULD BE ALLOWED TO AMEND THEIR
        AFFIRMATIVE DEFENSES ........................................... 8

        A. Defendants' Proposed Defenses are Viable ........................... 9

        B. Plaintiff Has Had Notice of Defendants' Arguments ............ 11

        C. No "Substantial Prejudice" Exists ........................................ 12

CONCLUSION AND RELIEF ........................................................ 13

CERTIFICATE OF SERVICE ....................................................... 15

APPENDIX TO DEFENDANTS' MOTION TO AMEND
AFFIRMATIVE DEFENSES ......................................................... 16

### MOST RELEVANT OR CONTROLLING AUTHORITIES

Fed. R. Civ. Pro. 15

*Foman v. Davis*, 371 U.S. 178, 182 (1962) (Exhibit 15).

*Wade v. Knoxville Utilities Bd*., 259 F.3d 452, 459 (6th Cir. 2001) (Exhibit 16).

### INDEX OF AUTHORITIES

**Cases**                                                                    **PAGE**

*Brown v. Union Banking Co.,* 274 Mich. 499 (1936) ............................................. 11

*Duggins v. Steak 'N Shake, Inc.,* 195 F.3d 828, 834 (6th Cir., 1999) ..................... 12

*Foman v. Davis* 371 U.S. 178, 182(1962) ................................................. 9

*Gearhart Industries, Inc. v. Smith Intern., Inc.,* 741 F.2d 707, 719
(5th Cir., 1984) ..................................................................................... 10

*Hamilton v. Gordon*, 135 Mich.App. 289, 294 (1984) .......................................... 10

*Mills v. United Producers, Inc.,* No. 11-13148-BC, 2012 WL 4692341, at *3
(E.D. Mich. Oct. 3, 2012) ..................................................................... 12

*People v. Leonard*, 421 Mich. 207, 220, 364 N.W.2d 625 (1985) ......................... 9

*Wade v. Knoxville Utilities Bd*., 259 F.3d 452, 459 (6th Cir. 2001) ....................... 9

**Civil Code of Qatar**

*Civil Code of Qatar, Article 568* ............................................................. 7

**Statutes**

Fed.R.Civ.P. 15(a) ................................................................................. 9, 14

Fed. R. Civ. Pro. 15(a)(2) ..................................................................... 6, 9

## <u>ISSUE PRESENTED</u>

I.    Should the Defendants be granted leave to add the affirmative defenses of (1) waiver and estoppel; and (2) illegal and *ultra vires* conduct in violation of public policy, where Fed. R. Civ. Pro. 15(a)(2) provides that the Court "should freely give leave when justice so requires," where discovery does not close until February 14, 2019, where Plaintiff has had prior notice of Defendants' arguments, where no depositions have yet been taken, and where no substantial prejudice will result from the amendment?

## BACKGROUND

Plaintiff BEMO USA, WLL (QATAR) ("Plaintiff"), is a company incorporated in the country of Qatar.  Plaintiff's primary business is to design and provide free-form and curved roofing panels used in specialty buildings.  *See, e.g., http://www.bemousa.com.*

Plaintiff is not a bank.  Under Qatari law, only licensed financial institutions may lend money for interest.  *Civil Code of Qatar, Article 568. Ex. 1.* Nevertheless, Plaintiff and Defendant LXR Biotech, LLC ("LXR") were parties to six promissory notes which purport to charge interest.  *Ex. 2-7.*  Plaintiff claims that it is owed principal, interest, and fees on the notes.  *Complaint, Counts 1-6.*

Each of the promissory notes has a provision under which debt would convert to an equity interest in LXR.  The first note states that it would convert to an equity ownership interest in LXR if LXR's net income before taxes were to exceed $8,064,744 on December 31, 2014.   *Ex. 2, ¶2.*  The other notes provide that they will convert to an equity ownership interest under the terms of a separate "Pre-Incorporation Agreement" among Plaintiff and Defendant Krause.  *Ex. 3-7.* The Pre-Incorporation Agreement provides numerous triggers for the notes' conversion.  *Ex. 8.*  LXR did not earn net income before taxes in excess of $8,064,744 on December 31, 2014.  Moreover, not all of the triggers in the Pre-Incorporation agreement were achieved.

Nevertheless, documents reviewed and produced during discovery demonstrate that the parties amended their agreements and/or waived the triggers in the promissory notes and Pre-Incorporation Agreement, and converted notes into equity.

For example, in a sworn affidavit, Plaintiff's principal, Richard Kovach, stated that, as of January 28, 2016, he was a "shareholder" of LXR Biotech, LLC. *Ex. 9.* Likewise, one of Plaintiff's top executives, Wade Dann, testified under oath in a proceeding that BEMO "had [LXR] promissory notes … that converted to equity," and that LXR owed "nothing" to BEMO. *Ex. 10.* Indeed, LXR's own books and records show BEMO as an equity holder in LXR.[1] Thus, there is no question that the parties either amended their agreements, and/or waived certain provisions of their agreements, to convert amounts owing under notes to equity.

## ARGUMENT

### I. DEFENDANTS SHOULD BE ALLOWED TO AMEND THEIR AFFIRMATIVE DEFENSES.

Defendants should be allowed to amend their affirmative defenses to (1) add the related defenses of illegality, *ultra vires* conduct, and/or violations of public

---

[1] LXR's financial records have been produced as "confidential" in this case pursuant to a stipulated protective order and therefore are not attached to this motion. Examples of financial records showing BEMO as an equity holder of LXR, produced to Plaintiff as bates numbered documents L001981 and L002164, will be available at the hearing on this motion.

policy; and (2) add the related defenses of waiver and estoppel.[2]  Fed. R. Civ. Pro. Rule 15(a) provides that a party may amend its pleading "with … the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2).

The Supreme Court elaborated in *Foman v. Davis*, 371 U.S. 178, 182(1962): "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."  *Id.*  Therefore, "[i]f the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Id.*  Leave should be given "[i]n the absence of … undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Id.*

Delay alone "[is] not sufficient reason to deny" a motion to amend. *Wade v. Knoxville Utilities Bd*., 259 F.3d 452, 459 (6th Cir. 2001).  Rather, "[n]otice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted."  *Id.* at 458-459.

## A.    <u>Defendants' Proposed Defenses are Viable.</u>

First, Defendants propose to add the related affirmative defenses of waiver and estoppel.   "A waiver is ordinarily an intentional relinquishment or

---

[2]    Defendants also seek to withdraw their previously pled affirmative defenses of: 1) Payment; 2) Conditions subsequent; and 3) Defenses at law. *Ex. 14*

abandonment of a known right or privilege." *People v. Leonard*, 421 Mich. 207, 220, 364 N.W.2d 625 (1985). Here, the promissory notes and Pre-Incorporation Agreement contain certain triggers for the conversion of debt to equity that admittedly were not met. Yet evidence produced in discovery shows that BEMO's principals believed that the "promissory notes … converted to equity," and LXR documents show the same. Therefore, either the parties' agreements were amended, or the triggering provisions were waived.

Estoppel is "a bar which precludes a person from denying the truth of a fact which has in contemplation of law become settled by the act of the party himself, express or implied. If one's conduct induces another to believe in the existence of certain facts, and the other acts thereon to his prejudice, the former is estopped to deny that the state of facts does in truth exist." *Hamilton v. Gordon*, 135 Mich.App. 289, 294 (1984). Richard Kovach and Wade Dann, two principals of BEMO, made statements under oath to the effect that notes had converted to equity, and should not be allowed to contravene such statements now.

Second, Defendants seek to add the related affirmative defenses of illegality, *ultra vires* conduct, and violations of public policy relating to Plaintiff's lack of authority to lend money for interest. Plaintiff is incorporated in the country of Qatar, which allows only licensed financial institutions to lend money for interest. *Ex. 1*. The scope of a corporation's powers is determined by "its charter or the

laws of the state of incorporation." *Gearhart Industries, Inc. v. Smith Intern., Inc.,* 741 F.2d 707, 719 (5th Cir., 1984).

Plaintiff is a supplier of specialty roofing and related products, not a bank. It does not have the legal authority to lend money for interest under Qatari law. Therefore, its conduct is illegal, *ultra vires,* and void as against public policy.

The Michigan Supreme Court made such a ruling in *Brown v. Union Banking Co.,* 274 Mich. 499 (1936). In *Brown,* a bank sold plaintiff certain bonds. *Id.* at 500. At the time, it was against Michigan public policy for a bank to assume a contingent liability which might "imperil the security of depositors … [and] prevent banking officials … from ascertaining its exact financial condition." *Id.* at 503. The Court found the arrangement "illegal as being ultra vires and contrary to the public policy" of the state, and that the bond contract was void. *Id.* at 504-505.

### B.   Plaintiff Has Had Notice of Defendants' Arguments.

Plaintiff has had prior notice of the issues raised by Defendants' proposed affirmative defenses. As to the defenses of waiver and estoppel, Plaintiff has known from the beginning that whether the promissory notes converted to equity would be a key issue in the case. Thus, in Plaintiff's first discovery requests, Plaintiff asked, "[d]id BEMO's promissory notes convert into a membership or shareholder interest in Defendants?" *Ex. 11, Interrogatory 9.* Defendants answered the interrogatory, stating that "the notes converted into a membership

interest in LXR Biotech LLC because the parties agreed that they would convert." *Id.*  In addition, in response to Plaintiff's interrogatory 7 (concerning reasons why payments were not made on the promissory notes), Defendants answered that "the loans converted to equity and no payment was owed."  *Ex. 11.*

Likewise, as to the defenses of illegality and *ultra vires* conduct, Plaintiff has been on notice that Defendants intended to make these arguments since, at the latest, November 14, 2018, when Defendants responded to Plaintiff's discovery requests.   In response to Plaintiff's Interrogatory 6 (concerning Defendants' affirmative defense of unclean hands), Defendants answered that "[o]n information and belief, Plaintiff is not authorized to lend money for interest under the laws of Qatar." *Ex. 11.*  Furthermore, on December 21, 2018, Defendants served requests for admissions, interrogatories, and document requests concerning Plaintiff's authorization and authority to lend money for interest.  *Ex. 12, Request for admission 1, 2; Request for Documents 1, 2.*

### C.   No "Substantial Prejudice" Exists.

Substantial prejudice does not exist here.   "Prejudice in the context of Rule 15 means more than the inconvenience of having to respond to a claim or defense." *Mills v. United Producers, Inc.,* No. 11-13148-BC, 2012 WL 4692341, at *3 (E.D. Mich. Oct. 3, 2012).  Cases where substantial prejudice is found almost inevitably

involve motions to amend made after the close of discovery.  *See, e.g., Duggins v. Steak 'N Shake, Inc.,* 195 F.3d 828, 834 (6th Cir., 1999).

Here, discovery remains open for 30 more days, and depositions have yet to be taken.[3] *Ex. 13, Scheduling Order.*  Defendants have already produced documents, such as the Kovacks' affidavit, Dann testimony, and LXR books and records, supporting their waiver and estoppel defenses, and have served discovery to Plaintiff on all of the proposed affirmative defenses.  Plaintiff continues to have the opportunity to take discovery on these affirmative defenses, and given that depositions have not yet occurred, there is no need to repeat any depositions. Because the proposed amendments will not substantially prejudice the Plaintiff, the motion should be granted.

## CONCLUSION AND RELIEF

Defendants seek to amend their affirmative defenses to raise defenses that are supported by documents and records located and produced by Defendants in discovery.  In particular, Defendants seek to plead as defenses that (1) that terms of the agreements among the parties were waived and that Plaintiff is estopped from enforcing the agreements as written; and (2) that the loaning of money by Plaintiff, a non-financial institution, for interest,  is illegal in its country of incorporation, and that Plaintiff did not have the authority to lend money for interest, and thus the

---

[3]  The parties currently plan on taking depositions during the last week of January and first week of February.

promissory notes are illegal, the Plaintiff's agreements are *ultra vires,* and the promissory notes and related agreements void under public policy.

As the Supreme Court has held, "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." Plaintiff has been on notice of Defendants' arguments for some time, and no substantial prejudice will befall them because of the amendments, given that discovery has not yet closed and depositions have yet to occur.

Defendants request that the motion to amend be granted, and that they be allowed to file the proposed amended affirmative defenses in the form of attached exhibit 13.

Respectfully Submitted,

OTTENWESS, TAWEEL & SCHENK PLC

By:  /s/Thomas P. Bruetsch
Thomas P. Bruetsch (P57473)
535 Griswold, Suite 850
Detroit, Michigan  48226
(313) 965-2121
TBruetsch@OttenwessLaw.com

Dated:  January 15, 2019

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record.

By:  /s/Sandra Slewa_____
OTTENWESS, TAWEEL & SCHENK, PLC

Dated: January 15, 2019

UNITED STATES OF AMERICA

IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEMO USA, WLL (QATAR),

    Plaintiff,

v.                         Case No. 18-cv-10674

LXR BIOTECH, LLC, LXR        Hon. Sean F. Cox
DISTRIBUTING, LLC, ETERNAL   Magistrate Judge Elizabeth A. Stafford
ENERGY, LLC, LXR BIOTECH
CORPORATION, LXR
DISTRIBUTION CORPORATION,
ANDREW KRAUSE,
And JOHN AND JANE DOES,

    Defendants.

_____

McDONALD TINKER PA
By:  Corey M. Adams, #27253
300 W. Douglas, Suite 500
Wichita, KS  67202
cadams@mcdonaldtinker.com

SILVERMAN & MORRIS PLLC
By:  Thomas R. Morris (P39141)
32300 Northwestern Highway,
Suite 215
Farmington Hills, MI  48334
morris@silvermanmorris.com

Attorneys for Plaintiff

OTTENWESS TAWEEL & SCHENK
PLC
By:  Thomas P. Bruetsch (P57473)
535 Griswold, Suite 850
Detroit, Michigan  48226
TBruetsch@OttenwessLaw.com

LAW OFFICE OF JOHN M.
KETZLER PLLC
By:  John M. Ketzler (P53044)
4237 North Atlantic Blvd.
Auburn Hills, Michigan  48326
johnketzler@jketzlerlaw.com

Attorneys for Defendants

_____

## APPENDIX IN  SUPPORT OF DEFENDANTS'
## MOTION TO AMEND AFFIRMATIVE DEFENSES

## <u>TABLE OF CONTENTS</u>

**EXHIBIT NO.**                    **DESCRIPTION**

**1.**     Qatar Law Regarding Charging Interest on Loans

**2.**     December 22, 2013 Promissory Note

**3.**     February 26, 2014 Promissory Note

**4.**     March 28, 2014 Promissory Note

**5.**     March 28, 2014 Promissory Note (2)

**6.**     June 13, 2014 Promissory Note

**7.**     October 13, 2014 Promissory Note

**8.**     February 26, 2014 Pre-Incorporation Agreement

**9.**     Affidavit of Richard E. Kovach

**10.**    November 1, 2016 Jury Trial Hearing Transcript

**11.**    Defendant LXR Biotech, LLC's Answers to Plaintiff's First
           Interrogatories

**12.**    Defendants' First Discovery Requests to Plaintiff

**13.**    Amended Scheduling Order

**14.**    Proposed Amended Affirmative Defenses

**15.**    *Forman v. Davis*

**16.**    *Johnnie Wade, Plaintiff-Appellant v. Knoxville Utilities Board,
           Defendant-Appellee*

# EXHIBIT 1

- <u>Previous</u>
- <u>Next</u>

# Qatar: Charging interest

**Author: | Published: 20 May 2016**

## Al Tamimi & Company

### Address

Al Jazeera Tower, 7th Floor
61 Conference Street, Zone 61
PO Box 23443
West Bay
Doha, Qatar

### Telephone

+974 4457 2777

### Fax

+974 4436 0921 <u>Visit Website</u>

A common concern among lenders is whether Qatari law allows the payment of interest on loans.



*Hani Al Naddaf*

The main concern derives from the fact that interest is generally prohibited under the Islamic Shariah, which is embedded in many provisions of law in Qatar. For instance, article 1 of the Qatari Constitution provides that Islam is the state's religion and the Islamic Shariah is the main source of its legislation. Article 1 of Qatari Law No. 22 of 2004 (the Civil Code) provides that in the absence of other legislation, the judge must decide according to the requirements of the Islamic Shariah.

Charging interest and, more generally, remunerating a lender, is a concept that is generally considered as valid and enforceable around the world. However, in Qatar, one needs to differentiate

between loans granted by licensed financial institutions and loans granted by all other parties.

As a general rule, interest on loans other than loans granted by licensed financial institutions is not permitted in Qatar, pursuant to the provisions of the Civil Code.

Article 568 of the Civil Code provides that:

*If the loan contract included remuneration in excess of the lent monies under the contract, excluding the necessary guarantees securing the lender's right, the remuneration condition shall be void but the contract as a whole shall remain valid.*

Accordingly, assuming the absence of special banking laws and regulations, loans must be interest free and the restitution of the principal amount (in the case of a loan of a sum of money) is the borrower's only obligation under the loan.

However, article 268 of the Civil Code provides that:

*If the obligation concerns an amount of money which the debtor fails to pay after being notified and the creditor proves that he has suffered damage as a result, the court may order the debtor to pay damages observing the principles of justice.*

The court may therefore decide that the borrower must pay damages as a result of its failure to repay its due debt.

## Local banks

While interest on loans is generally prohibited under the Civil Code when the lender is not a licensed financial institution, the situation is completely different when the loan is granted by a local bank (or a branch of a foreign bank) licensed to conduct banking activities by the Qatar Central Bank (QCB).

The QCB law No 13 of 2012 (QCB Law), allows banks to charge interest in accordance with the QCB regulations.

The QCB Instructions to Banks (QCB Instructions) also clearly state that licensed banks have the discretionary power to apply or not to apply interest. Therefore, disregarding any issues relating to banking monopoly rules in Qatar, a foreign bank that does not have a branch licensed by the QCB to carry out banking activities in Qatar, may find that the local courts invalidate the interest applied on Qatari law-governed loans. In order to mitigate this risk, foreign banks entering into transactions with Qatari borrowers often choose a foreign law to govern their loan documentation and submit any

disputes that arise in connection with their loan to international arbitration.

## Contradictory case-law

Despite the QCB Law provisions and the QCB Instructions, which authorise the application of interest on loans, the Qatari courts have a conservative view in respect of interest and default interest application, even for loans entered into by licensed banks in Qatar.

This conservative view and refusal to admit the right to apply interest and default interest for banks in Qatar, had caused confusion in the banking sector for several years. This confusion was resolved when the Qatar Court of Cassation, in several rulings in 2010, overruled decisions of the Court of Appeal which did not uphold the agreement of the parties in respect of application of interest and default interest in a loan transaction between a licensed bank and its customer.

In its decision, the Court of Cassation noted that loans granted by banks in Qatar were to be considered as commercial acts. It further noted that article 110 of law No. 33 of 2006 (the previous QCB Law), which states that 'the QCB has the right to apply interest or revenue to be determined by the QCB on scheduled credit facilities unless the agreement between the lending financial institutions with its customers states otherwise', clearly provided for a bank's right to apply interest on loans.

The Court of Cassation also clarified that interest could either be so-called compensatory interest or default interest. According to the Court's definition, compensatory interest applies in return for lending an amount of money to be used by the debtor for an agreed maturity. Default interest applies if the debtor fails to pay the due amount of the loan on its due date. In this decision, compensatory interests refers to the contractual interest payments agreed between the bank and its customers.

The Court of Cassation has also clarified that banks have the right to claim default interest in addition to compensatory interest even if the agreement between the banks and their clients did not stipulate for the application of such default interest.

However, in 2012 the Court of Cassation rendered a judgment upholding the Court of Appeal's ruling which granted the claimant the full amount of the principal in addition to a lump sum compensation of QAR 100,000 (approximately $27, 000).

The Court of Cassation refused the bank's argument regarding the application of the default interest agreed upon in the loan agreement. The Court of Cassation confirmed the Court of Appeal's

authority to deal with the issue of measuring damages. Finally, the Court confirmed that the compensation amount of QAR 100,000 had accounted for and included the date the defendant fell behind on his repayments until the date the judgment was issued. This timeframe, in the Court's estimation, was valued appropriately.

The 2012 judgment has significant implications for day-to-day transactional banking activities conducted in Qatar. In considering this case the Court appears to have overlooked the substance of the terms agreed between the parties regarding the interest rate. In addition, the ruling contradicts the Court of Cassation previous ruling of 2011, which confirmed the enforceability of the interest rate stipulated in the loan contract. As such, the interest associated with facility agreements granted by banks in Qatar remains a grey area with a lot of unpredictability.

*Hani Al Naddaf*

The material on this site is for financial institutions, professional investors and their professional advisers. It is for information only. Please read our terms and conditions and privacy policy before using the site. All material subject to strictly enforced copyright laws. © 2019 Euromoney Institutional Investor PLC. For help please see our FAQ.

**Chapter Five: Loans**

Article 564

A loan shall be defined as a contract under which the lender undertakes to transfer the title to a certain amount of money to the borrower, or anything similar, provided that such amount or thing shall be returned to the former in the same type, condition and quantity.

Article 565

1. The lender shall deliver the agreed item to the borrower at the time of conclusion of the contract, unless another time is agreed.
2. Where such item is lost prior to delivery, the lender shall bear the consequences of such loss.

Article 566

The lender shall not be held liable for the entitlement to the borrowed item, unless there is an agreement to such liability or the lender has deliberately concealed the cause of such entitlement.

Article 567

1. Where a concealed defect is detected in the borrowed item and the borrower opts to retain it, the borrower shall be liable to repay the value of such item in its defective condition.
2. Where the lender has deliberately concealed the cause of such defect, he shall be liable for any damage caused by it.

Article 568

Where the loan contract provides for a benefit greater than the amount agreed in the contract, other than the security to the right of the lender, the provision shall be annulled while the contract shall be valid.

Article 569

1. A borrower shall return a similar item on the agreed maturity date or immediately when it becomes outstanding.
2. Where such date is not agreed, or where it is agreed to return such item when capable or solvent, the court shall fix an appropriate date for the return of the item according to the circumstances.

Article 570

# EXHIBIT 2

## CONVERTIBLE
## PROMISSORY NOTE

$1,834,111.41                                    December 22nd, 2013

     FOR VALUE RECEIVED, LXR BIOTECH, LLC, a Michigan limited liability company ("Borrower"), hereby promises to pay to the order of BEMO USA WLL (QATAR) (together with any and all of its successors and assigns and/or any other holder of this Note, "Lender"), without offset, in immediately available funds in lawful money of the United States of America, the principal sum ("the sum") of One Million Eight Hundred Thirty Four Thousand One Hundred and Eleven and Forth One Cents) ($1,834,111.41) (or such lesser sum as may have actually advanced by the Lender), together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

     Section 1. <u>Payment Schedule and Maturity Date.</u> Subject to the conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall be due and payable in full on December 31, 2015 (the "Maturity Date"), the final maturity of this Note. Lender shall advance "the sum" on or before December 26, 2013. Subject to the provision for the conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, monthly interest payments shall be due and payable in equal monthly payments beginning on the last day of each month commencing on January 31, 2014. Commencing January 31, 2015, monthly principle and interest payments shall commence so that after 12 monthly payments, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall be paid in full on or before December 31, 2015 (the "Maturity Date"). Upon receipt of the loan proceeds, Borrower agrees to pay Lender an origination fee in US Dollars of $33,500.00.

     Section 2. <u>Conversion.</u> In the event that the Net Income before taxes as set forth in Borrower's Projected Income Statement-V2 2014 meets or exceeds the sum of $8,064,744 on December 31, 2014, then "the sum" of this Convertible Promissory Note shall be considered to be paid in full and Borrower shall executed all documents necessary to transfer and convey to Lender a 20% ownership interest in Borrower.

     Section 3. <u>Interest Rate.</u>

     (a) <u>Annual Interest Rate.</u> The unpaid principal balance of this Note from day to day to day outstanding which is not past due, shall bear interest at eight (8%) percent per anum.

     (b) Past Due Rate. If any amount payable by Borrower is not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at the rate of ten (10%) per anum.

     Section 4. <u>Prepayment.</u> Borrower may prepay the principal balance of this Note, in full at any time or in part from time to time, without fee, premium or penalty, provided that: (a) Lender shall have actually received from Borrower prior written notice of (i) Borrower's intent to prepay, (ii) the amount of principal which will be prepaid (the "Prepaid Principal"), and (iii) the date on which the prepayment will be made.



Section 5. <u>Late Charges.</u> If Borrower shall fail to make any payment under the terms of this Note (other than the payment due at maturity) within fifteen (15) days after the date such payment is due, Borrower shall pay to Lender on demand a late charge equal to two percent (2%) of the amount of such payment. Such fifteen (15) day period shall not be construed as in any way extending the due date of any payment. The late charge is imposed for the purpose of defraying the expenses of Lender incident to handling such delinquent payment. This charge shall be in addition to, and not in lieu of, any other amount that Lender may be entitled to receive or action that Lender may be authorized to take as a result of such late payment.

Section 6. <u>Certain Provisions Regarding Payments.</u> All payments made under this Note shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest, to unpaid principal, and to any other sums due and unpaid to Lender under the Loan Documents, in such manner and order as Lender may elect in its sole discretion, any instructions from Borrower or anyone else to the contrary notwithstanding. Remittances shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and shall be accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect. Payments received after 2:00 p.m. shall be deemed to be received on, and shall be posted as of, the following Business Day. Whenever any payment under this Note or any other Loan Document falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

Section 7. <u>Events of Default.</u> The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

(a) Borrower fails to pay when and as due and payable any amounts payable by Borrower to Lender under the terms of this Note.

(b) Any covenant, agreement or condition in this Note is not fully and timely performed, observed or kept, subject to any applicable grace or cure period.

Section 8.    Remedies. Upon the occurrence of an Event of Default, Lender may at any time thereafter exercise any one or more of the following rights, powers and remedies:

(a)    Lender may accelerate the Maturity Date and declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts payable hereunder and under the other Loan Documents, at once due and payable, and upon such declaration the same shall at once be due and payable.

(b)    Lender may set off the amount due against any and all accounts, credits, money, securities or other property now or hereafter on deposit with, held by or in the possession of Lender to the credit or for the account of Borrower, without notice to or the consent of Borrower.

(c)    Lender may exercise any of its other rights, powers and remedies under the Loan Documents or at law or in equity.

Section 9.    Remedies Cumulative. All of the rights and remedies of Lender under this Note are cumulative of each other and of any and all other rights at law or in equity, and the exercise by Lender of any one or more of such rights and remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other rights and remedies. No single or partial exercise of any right or remedy shall exhaust it or preclude any other or further exercise thereof, and every right and remedy may be exercised at any time and from time to time. No failure by Lender to exercise, nor delay in exercising, any right or remedy shall operate as a waiver of such right or remedy or as a waiver of any Event of Default.

Section 10.    Costs and Expenses of Enforcement. Borrower agrees to pay to Lender on demand all costs and expenses incurred by Lender in seeking to collect this Note or to enforce any of Lender's rights and remedies under the Loan Documents, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with bankruptcy, insolvency or appeal.

Section 11. Service of Process. Borrower hereby consents to process being served in any suit, action, or proceeding instituted in connection with this Note by (a) the mailing of a copy thereof by certified mail, postage prepaid, return receipt requested, to Borrower and (b) serving a copy thereof upon Andrew Krause, the agent hereby designated and appointed by Borrower as Borrower's agent for service of process. Borrower irrevocably agrees that such service shall be deemed to be service of process upon Borrower in any such suit, action, or proceeding. Nothing in this Note shall affect the right of Lender to serve process in any manner otherwise permitted by law and nothing in this Note will limit the right of Lender otherwise to bring proceedings against Borrower in the courts of any jurisdiction or jurisdictions, subject to any provision or agreement for arbitration or dispute resolution set forth in the Loan Agreement.

Section 12.    Heirs, Successors and Assigns. The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents.

Section 13.   <u>General Provisions.</u>   Time is of the essence with respect to Borrower's obligations under this Note. Borrower and each party executing this Note as Borrower hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non exclusive personal jurisdiction of any Court in Michigan; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate to the Loan any and all rights against Borrower and any security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Captions and headings in this Note are for convenience only and shall be disregarded in construing it. This Note and its validity, enforcement and interpretation shall be governed by the laws of the state in which payment of this Note is to be made (without regard to any principles of conflicts of laws) and applicable United States federal law. THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY MICHIGAN LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW. Whenever a time of day is referred to herein, unless otherwise specified such time shall be the local time of the place where payment of this Note is to be made. The term "Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which this Note is payable (excluding Saturdays and Sundays). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement. The words "include" and "including" shall be interpreted as if followed by the words "without limitation."

Section 14.   <u>Notices.</u>   All Notices required or which any party desires   to give hereunder or under any other Loan Document shall be in writing and, unless   otherwise specifically provided in such other Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service or



by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any Notice shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein; provided that service of a Notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Note or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason. As used herein, "Notice" means a notice, request, consent, demand or other communication given in accordance with the provisions of this Section.

The address of Borrower is:

LXR BIOTECH, LLC,
4225 N. Atlantic Blvd                    *1*
Auburn Hills, MI. 48326

The address of Lender is:

BEMO USA WLL (Qatar)
P.O. Box 19584
Doha, Qatar

Section 15.   <u>No Usury.</u>   It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents. If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Lender's exercise of the option to accelerate the Maturity Date, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note and all other indebtedness secured by the Mortgage, and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and there under reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use or forbearance of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan.



_____

LXR Biotech, LLC
Andrew Krause, Managing Member

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

_____    12-22-13

Witness
John Lee


Section 16. <u>Personal Guaranty of Andrew Krause.</u>  The undersigned Andrew Krause absolutely and unconditionally guarantees full and prompt payment of the indebtedness owed by the Borrower to the Lender and the discharge of all obligations of the Borrower to the Lender under this Convertible Promissory Note.  This is a guaranty of payment and performance and not collection so that Lender may enforce this guaranty against Andrew Krause without Lender having exhausted its remedies against the Borrower.

_____

Andrew Krause

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

_____    12-22-13

Witness
John Lee



_____

BEMO USA WLL (Qatar)

_____

Name

_____

Title

# EXHIBIT 3

## CONVERTIBLE
## PROMISSORY  NOTE

$1,600,000.00                                           February 26 , 2014

FOR VALUE RECEIVED, LXR BIOTECH, LLC, a Michigan limited liability company ("Borrower"), hereby promises to pay to the order of BEMO USA WLL (QATAR) (together with any and all of its successors and assigns and/or any other holder of this Note, "Lender"), without offset, in immediately available funds in lawful money of the United States of America, the principal sum ("the sum") of One Million Six Hundred Thousand and Zero Cents) ($1,600,000.00) (or such lesser sum as may have actually advanced by the Lender), together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

Section 1 .   Payment  Schedule  and  Maturity  Date. Subject to the possible conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall be due and payable in full on December 31, 2015 (the "Maturity Date"), the final maturity of this Note. Lender shall advance "the sum" on or before March 3, 2014 . Subject to the provision for the conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, monthly interest payments shall be due and payable in equal monthly payments beginning on the last day of each month commencing on January 31, 2014. Commencing January 31, 2015, monthly principle and interest payments shall commence so that after 12 monthly payments, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall be paid in full on or before December 31, 2015 (the "Maturity Date"). Upon receipt of the loan proceeds, Borrower agrees to pay Lender an origination fee in US Dollars of $10,000.00.

Section 2.    Conversion.   The terms of the Pre-Incorporation Agreement (PIA) dated February 26, 2014 between Andrew H. Krause (individually or by nominee) and BEMO USA, WLL (Qatar) is specifically incorporated by reference into this promissory note. Upon fulfillment of all of the conditions in the PIA, including but not limited to, the corporate formation processes, then this Promissory Note will be amended to change the Borrower to LXR Biotech Corporation and LXR Distribution Corporation and Andrew Krause individually and the amount of this promissory note will be considered a capital contribution to the newly created entities in accordance with the terms set forth in the aforementioned PIA.

Section 3.    Interest Rate.

(a)    Annual Interest Rate. The unpaid principal balance of this Note from day to day outstanding which is not past due, shall bear interest at eight (8%) percent per anum.

(b)    Past Due Rate. If any amount payable by Borrower is not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at the rate of ten (10%) per anum.

Section 4.    Prepayment.   Borrower may prepay the principal balance of this Note. in full at any time or in part from time to time, without fee, premium or penalty, provided that: (a) Lender shall have actually received from Borrower prior written notice of (i) Borrower's intent

to prepay, (ii) the amount of principal which will be prepaid (the "Prepaid Principal"), and (iii) the date on which the prepayment will be made.

Section 5.    Late Charges. If Borrower shall fail to make any payment under the terms of this Note (other than the payment due at maturity) within fifteen (15) days after the date such payment is due, Borrower shall pay to Lender on demand a late charge equal to two percent (2%) of the amount of such payment. Such fifteen (15) day period shall not be construed as in any way extending the due date of any payment. The late charge is imposed for the purpose of defraying the expenses of Lender incident to handling such delinquent payment. This charge shall be in addition to, and not in lieu of, any other amount that Lender may be entitled to receive or action that Lender may be authorized to take as a result of such late payment.

Section 6.    Certain Provisions Regarding Payments. All payments made under this Note shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest, to unpaid principal, and to any other sums due and unpaid to Lender under the Loan Documents, in such manner and order as Lender may elect in its sole discretion, any instructions from Borrower or anyone else to the contrary notwithstanding. Remittances shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and shall be accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect. Payments received after 2:00 p.m. shall be deemed to be received on, and shall be posted as of, the following Business Day. Whenever any payment under this Note or any other Loan Document falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

Section 7.    Events of Default. The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

(a)    Borrower fails to pay when and as due and payable any amounts payable by Borrower to Lender under the terms of this Note.

(b)    Any covenant, agreement or condition in this Note is not fully and timely performed, observed or kept, subject to any applicable grace or cure period.

Section 8.     Remedies.  Upon the occurrence of an Event of Default, Lender may at any time thereafter exercise any one or more of the following rights, powers and remedies:

(a)     Lender may accelerate the Maturity Date and declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts payable hereunder and under the other Loan Documents, at once due and payable, and upon such declaration the same shall at once be due and payable.

(b)     Lender may set off the amount due against any and all accounts, credits, money, securities or other property now or hereafter on deposit with, held by or in the possession of Lender to the credit or for the account of Borrower, without notice to or the consent of Borrower.

(c)     Lender may exercise any of its other rights, powers and remedies under the Loan Documents or at law or in equity.

Section 9.     Remedies Cumulative.  All of the rights and remedies of Lender under this Note are cumulative of each other and of any and all other rights at law or in equity, and the exercise by Lender of any one or more of such rights and remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other rights and remedies. No single or partial exercise of any right or remedy shall exhaust it or preclude any other or further exercise thereof, and every right and remedy may be exercised at any time and from time to time. No failure by Lender to exercise, nor delay in exercising, any right or remedy shall operate as a waiver of such right or remedy or as a waiver of any Event of Default.

Section 10.     Costs and Expenses of Enforcement.  Borrower agrees to pay to Lender on demand all costs and expenses incurred by Lender in seeking to collect this Note or to enforce any of Lender's rights and remedies under the Loan Documents, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with bankruptcy, insolvency or appeal.

Section 11.     Service of Process.  Borrower hereby consents to process being served in any suit, action, or proceeding instituted in connection with this Note by (a) the mailing of a copy thereof by certified mail, postage prepaid, return receipt requested, to Borrower and (b) serving a copy thereof upon Andrew Krause, the agent hereby designated and appointed by Borrower as Borrower's agent for service of process. Borrower irrevocably agrees that such service shall be deemed to be service of process upon Borrower in any such suit, action, or proceeding. Nothing in this Note shall affect the right of Lender to serve process in any manner otherwise permitted by law and nothing in this Note will limit the right of Lender otherwise to bring proceedings against Borrower in the courts of any jurisdiction or jurisdictions, subject to any provision or agreement for arbitration or dispute resolution set forth in the Loan Agreement.

Section 12.     Heirs, Successors and Assigns.  The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents.

Section 13.   General Provisions.  Time is of the essence with respect to Borrower's obligations under this Note. Borrower and each party executing this Note as Borrower hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non exclusive personal jurisdiction of any Court in Michigan; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate to the Loan any and all rights against Borrower and any security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full.  A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Captions and headings in this Note are for convenience only and shall be disregarded in construing it. This Note and its validity, enforcement and interpretation shall be governed by the laws of the state in which payment of this Note is to be made (without regard to any principles of conflicts of laws) and applicable United States federal law. THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY MICHIGAN LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW. Whenever a time of day is referred to herein, unless otherwise specified such time shall be the local time of the place where payment of this Note is to be made. The term "Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which this Note is payable (excluding Saturdays and Sundays). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement. The words "include" and "including" shall be interpreted as if followed by the words "without limitation."

Section 14.   Notices.   All Notices required or which any party desires  to give hereunder or under any other Loan Document shall be in writing and, unless  otherwise specifically provided in such other Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service or

by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any Notice shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein; provided that service of a Notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Note or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason. As used herein, "Notice" means a notice, request, consent, demand or other communication given in accordance with the provisions of this Section.

The address of Borrower is:

LXR BIOTECH, LLC,
4225 N. Atlantic Blvd
Auburn Hills, MI. 48326

The address of Lender is:

BEMO USA WLL (Qatar)
P.O. Box 19584
Doha, Qatar

Section 15.   No Usury.   It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents. If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Lender's exercise of the option to accelerate the Maturity Date, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note and all other indebtedness secured by the Mortgage, and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and there under reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use or forbearance of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan.

_____
LXR Biotech, LLC
Andrew Krause, Managing Member

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

_____
Witness
John Lee

Section 16. <u>Personal Guaranty of Andrew Krause.</u> The undersigned Andrew Krause absolutely and unconditionally guarantees full and prompt payment of the indebtedness owed by the Borrower to the Lender and the discharge of all obligations of the Borrower to the Lender under this Convertible Promissory Note. This is a guaranty of payment and performance and not collection so that Lender may enforce this guaranty against Andrew Krause without Lender having exhausted its remedies against the Borrower.

_____
Andrew Krause

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

_____
Witness
John Lee

_____
BEMO USA WLL (Qatar)

_____Wade Rowland Dann_____
Name

_____Director_____
Title

# EXHIBIT 4

## CONVERTIBLE
## PROMISSORY  NOTE

$500,000.00                                             March 28 , 2014

     FOR VALUE RECEIVED, LXR Distributing LLC,a Michigan limited liability company ("Borrower"). hereby promises to pay to the order of  BEMO USA WLL (QATAR) (together with any and all of its successors and assigns and/or any other holder of this Note, "Lender"). without offset. in immediately available funds in lawful money of the United States of America. the principal sum ("the sum") of One Million Six Hundred Thousand and Zero Cents) ($500,000.00) (or such lesser sum as may have actually advanced by the Lender). together with interest on the unpaid principal balance of this Note from  day to  day outstanding as hereinafter provided.

     Section 1 .   <u>Payment    Schedule    and    Maturity    Date.</u> Subject to the possible conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder. shall be due and payable in full on December 31, 2015 (the "Maturity Date"). the  final maturity of this Note.Lender shall advance "the sum"on or before March 3, 2014 . Subject to the provision for the conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, monthly interest payments shall be due and payable in equal monthly payments beginning on the last day of each month commencing on April 30, 2014. Commencing April 30, 2015, monthly principle and interest payments shall commence so that after 12 monthly payments,  the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall  be paid in full on or before December 31, 2015 (the "Maturity Date"). Upon receipt of the loan proceeds, Borrower agrees to pay Lender an origination fee in US Dollars of $10,000.00.

     <mark>Section 2.     Conversion.   The terms of the Pre-Incorporation Agreement (PIA) dated February 26, 2014 between Andrew H. Krause (individually or by nominee) and BEMO USA, WLL (Qatar) is specifically incorporated by reference into this promissory note.  Upon fulfillment of all of the conditions in the PIA, including but not limited to, the corporate formation processes, then this Promissory Note will be amended to change the Borrower to LXR Biotech Corporation and LXR Distribution Corporation and Andrew Krause individually and the amount of this promissory note will be considered a capital contribution to the newly created entities in accordance with the terms set forth in the aforementioned PIA.</mark>

     Section 3.   <u>Interest Rate.</u>

       (a)    <u>Annual Interest Rate.</u> The unpaid principal balance of this Note from day to day to day outstanding which is not past due, shall bear interest at eight (8%) percent per anum.

       (b)    Past Due Rate. If any amount payable by Borrower i s not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at the rate of ten (10%) per anum.

     Section 4.   <u>Prepayment.</u>  Borrower may prepay the principal balance of this Note. in full at any time or in part from time to time, without fee. premium or penalty, provided that: (a) Lender shall have actually received from Borrower prior written notice of (i) Borrower's intent

to prepay, (ii) the amount of principal which will be prepaid (the "Prepaid Principal"), and (iii) the date on which the prepayment will be made.

      Section 5.    Late Charges. If Borrower shall fail to make any payment under the terms of this Note (other than the payment due at maturity) within fifteen (15) days after the date such payment is due, Borrower shall pay to Lender on demand a late charge equal to two percent (2%) of the amount of such payment. Such fifteen (15) day period shall not be construed as in any way extending the due date of any payment. The late charge is imposed for the purpose of defraying the expenses of Lender incident to handling such delinquent payment. This charge shall be in addition to, and not in lieu of, any other amount that Lender may be entitled to receive or action that Lender may be authorized to take as a result of such late payment.

      Section 6.    Certain Provisions Regarding Payments. All payments made under this Note shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest, to unpaid principal, and to any other sums due and unpaid to Lender under the Loan Documents, in such manner and order as Lender may elect in its sole discretion, any instructions from Borrower or anyone else to the contrary notwithstanding. Remittances shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and shall be accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect. Payments received after 2:00 p.m. shall be deemed to be received on, and shall be posted as of, the following Business Day. Whenever any payment under this Note or any other Loan Document falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

      Section 7.    Events of Default. The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

        (a)    Borrower fails to pay when and as due and payable any amounts payable by Borrower to Lender under the terms of this Note.

        (b)    Any covenant, agreement or condition in this Note is not fully and timely performed, observed or kept, subject to any applicable grace or cure period.

Section 8. <u>Remedies</u>. Upon the occurrence of an Event of Default, Lender may at any time thereafter exercise any one or more of the following rights, powers and remedies:

(a) Lender may accelerate the Maturity Date and declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts payable hereunder and under the other Loan Documents, at once due and payable, and upon such declaration the same shall at once be due and payable.

(b) Lender may set off the amount due against any and all accounts, credits, money, securities or other property now or hereafter on deposit with, held by or in the possession of Lender to the credit or for the account of Borrower, without notice to or the consent of Borrower.

(c) Lender may exercise any of its other rights, powers and remedies under the Loan Documents or at law or in equity.

Section 9. <u>Remedies Cumulative</u>. All of the rights and remedies of Lender under this Note are cumulative of each other and of any and all other rights at law or in equity, and the exercise by Lender of any one or more of such rights and remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other rights and remedies. No single or partial exercise of any right or remedy shall exhaust it or preclude any other or further exercise thereof, and every right and remedy may be exercised at any time and from time to time. No failure by Lender to exercise, nor delay in exercising, any right or remedy shall operate as a waiver of such right or remedy or as a waiver of any Event of Default.

Section 10. <u>Costs and Expenses of Enforcement.</u> Borrower agrees to pay to Lender on demand all costs and expenses incurred by Lender in seeking to collect this Note or to enforce any of Lender's rights and remedies under the Loan Documents, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with bankruptcy, insolvency or appeal.

Section 11. <u>Service of Process</u>. Borrower hereby consents to process being served in any suit, action, or proceeding instituted in connection with this Note by (a) the mailing of a copy thereof by certified mail, postage prepaid, return receipt requested, to Borrower and (b) serving a copy thereof upon Andrew Krause, the agent hereby designated and appointed by Borrower as Borrower's agent for service of process. Borrower irrevocably agrees that such service shall be deemed to be service of process upon Borrower in any such suit, action, or proceeding. Nothing in this Note shall affect the right of Lender to serve process in any manner otherwise permitted by law and nothing in this Note will limit the right of Lender otherwise to bring proceedings against Borrower in the courts of any jurisdiction or jurisdictions, subject to any provision or agreement for arbitration or dispute resolution set forth in the Loan Agreement.

Section 12. <u>Heirs, Successors and Assigns.</u> The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents.

Section 13.   <u>General Provisions.</u>  Time is of the essence with respect to Borrower's obligations under this Note. Borrower and each party executing this Note as Borrower hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non exclusive personal jurisdiction of any Court in Michigan; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate to the Loan any and all rights against Borrower and any security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Captions and headings in this Note are for convenience only and shall be disregarded in construing it. This Note and its validity, enforcement and interpretation shall be governed by the laws of the state in which payment of this Note is to be made (without regard to any principles of conflicts of laws) and applicable United States federal law. THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY MICHIGAN LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW. Whenever a time of day is referred to herein, unless otherwise specified such time shall be the local time of the place where payment of this Note is to be made. The term "Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which this Note is payable (excluding Saturdays and Sundays). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement. The words "include" and "including" shall be interpreted as if followed by the words "without limitation."

Section 14.   <u>Notices.</u>   All Notices required or which any party desires   to give hereunder or under any other Loan Document shall be in writing and, unless   otherwise specifically provided in such other Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service or

by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any Notice shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein; provided that service of a Notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Note or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason. As used herein, "Notice" means a notice, request, consent, demand or other communication given in accordance with the provisions of this Section.

The address of Borrower is:

LXR Distributing, LLC.
4225 N. Atlantic Blvd
Auburn Hills, MI. 48326

The address of Lender is:

BEMO USA WLL (Qatar)
P.O. Box 19584
Doha, Qatar

Section 15.    No Usury.    It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents. If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Lender's exercise of the option to accelerate the Maturity Date, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note and all other indebtedness secured by the Mortgage, and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and there under reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use or forbearance of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan.

LXR Distributing, LLC
Andrew Krause, Managing Member

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

Witness
John Lee

Section 16. Personal Guaranty of Andrew Krause. The undersigned Andrew Krause absolutely and unconditionally guarantees full and prompt payment of the indebtedness owed by the Borrower to the Lender and the discharge of all obligations of the Borrower to the Lender under this Convertible Promissory Note. This is a guaranty of payment and performance and not collection so that Lender may enforce this guaranty against Andrew Krause without Lender having exhausted its remedies against the Borrower.

Andrew Krause

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

Witness
John Lee

BEMO USA WLL (Qatar)

____Wade Rowland Dann_____
Name

____Director_____
Title

# EXHIBIT 5

## CONVERTIBLE
## PROMISSORY NOTE

$465000.00                                      March 28 , 2014

FOR VALUE RECEIVED, LXR BIOTECH, LLC,a Michigan limited liability company ("Borrower"), hereby promises to pay to the order of BEMO USA WLL (QATAR) (together with any and all of its successors and assigns and/or any other holder of this Note, "Lender"), without offset, in immediately available funds in lawful money of the United States of America, the principal sum ("the sum") of One Million Six Hundred Thousand and Zero Cents) ($465,000.00) (or such lesser sum as may have actually advanced by the Lender), together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

Section 1. _Payment Schedule and Maturity Date._ Subject to the possible conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall be due and payable in full on December 31, 2015 (the "Maturity Date"), the final maturity of this Note.Lender shall advance "the sum"on or before March 3, 2014 . Subject to the provision for the conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, monthly interest payments shall be due and payable in equal monthly payments beginning on the last day of each month commencing on April 30, 2014. Commencing April 30, 2015, monthly principle and interest payments shall commence so that after 12 monthly payments, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall be paid in full on or before December 31, 2015 (the "Maturity Date"). Upon receipt of the loan proceeds, Borrower agrees to pay Lender an origination fee in US Dollars of $10,000.00.

Section 2. Conversion. The terms of the Pre-Incorporation Agreement (PIA) dated February 26, 2014 between Andrew H. Krause (individually or by nominee) and BEMO USA, WLL (Qatar) is specifically incorporated by reference into this promissory note. Upon fulfillment of all of the conditions in the PIA, including but not limited to, the corporate formation processes, then this Promissory Note will be amended to change the Borrower to LXR Biotech Corporation and LXR Distribution Corporation and Andrew Krause individually and the amount of this promissory note will be considered a capital contribution to the newly created entities in accordance with the terms set forth in the aforementioned PIA.

Section 3. _Interest Rate._

   (a) _Annual Interest Rate._ The unpaid principal balance of this Note from day to day to day outstanding which is not past due, shall bear interest at eight (8%) percent per anum.

   (b) Past Due Rate. If any amount payable by Borrower i s not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at the rate of ten (10%) per anum.

Section 4. _Prepayment._ Borrower may prepay the principal balance of this Note, in full at any time or in part from time to time, without fee, premium or penalty, provided that: (a) Lender shall have actually received from Borrower prior written notice of (i) Borrower's intent

to prepay, (ii) the amount of principal which will be prepaid (the "Prepaid Principal"), and (iii) the date on which the prepayment will be made.

Section 5.    Late Charges. If Borrower shall fail to make any payment under the terms of this Note (other than the payment due at maturity) within fifteen (15) days after the date such payment is due, Borrower shall pay to Lender on demand a late charge equal to two percent (2%) of the amount of such payment. Such fifteen (15) day period shall not be construed as in any way extending the due date of any payment. The late charge is imposed for the purpose of defraying the expenses of Lender incident to handling such delinquent payment. This charge shall be in addition to, and not in lieu of, any other amount that Lender may be entitled to receive or action that Lender may be authorized to take as a result of such late payment.

Section 6.    Certain Provisions Regarding Payments. All payments made under this Note shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest, to unpaid principal, and to any other sums due and unpaid to Lender under the Loan Documents, in such manner and order as Lender may elect in its sole discretion, any instructions from Borrower or anyone else to the contrary notwithstanding. Remittances shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and shall be accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect. Payments received after 2:00 p.m. shall be deemed to be received on, and shall be posted as of, the following Business Day. Whenever any payment under this Note or any other Loan Document falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

Section 7.    Events of Default. The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

(a)    Borrower fails to pay when and as due and payable any amounts payable by Borrower to Lender under the terms of this Note.

(b)    Any covenant, agreement or condition in this Note is not fully and timely performed, observed or kept, subject to any applicable grace or cure period.

Section 8.     Remedies.  Upon the occurrence of an Event of Default, Lender may  at any time thereafter exercise any one or more of the following rights, powers and remedies:

(a)     Lender may accelerate the Maturity Date and declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts payable hereunder and under the other Loan Documents, at once due and payable, and upon such declaration the same shall at once be due and payable.

(b)     Lender may set off the amount due against any and all accounts, credits, money, securities or other property now or hereafter on deposit with, held by or in the possession of Lender to the credit or for the account of Borrower, without notice to or the consent of Borrower.

(c)     Lender may exercise any of its other rights, powers and remedies under the Loan Documents or at law or in equity.

Section 9.     Remedies Cumulative.  All of the rights and remedies of Lender under this Note are cumulative of each other and of any and all other rights at law or in equity, and the exercise by Lender of any one or more of such rights and remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other rights and remedies. No single or partial exercise of any right or remedy shall exhaust it or preclude any other or further exercise thereof, and every right and remedy may be exercised at any time and from time to time. No failure by Lender to exercise, nor delay in exercising, any right or remedy shall operate as a waiver of such right or remedy or as a waiver of any Event of Default.

Section 10.     Costs and Expenses of Enforcement.  Borrower agrees to pay to Lender on demand all costs and expenses incurred by Lender in seeking to collect this Note or to enforce any of Lender's rights and remedies under the Loan Documents, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with bankruptcy, insolvency or appeal.

Section 11.  Service of Process.  Borrower hereby consents to process being served in any suit, action, or proceeding instituted in connection with this Note by (a) the mailing of a copy thereof by certified mail, postage prepaid, return receipt requested, to Borrower and (b) serving a copy thereof upon Andrew Krause, the agent hereby designated and appointed by Borrower as Borrower's agent for service of process. Borrower irrevocably agrees that such service shall be deemed to be service of process upon Borrower in any such suit, action, or proceeding. Nothing in this Note shall affect the right of Lender to serve process in any manner otherwise permitted by law and nothing in this Note will limit the right of Lender otherwise to bring proceedings against Borrower in the courts of any jurisdiction or jurisdictions, subject to any provision or agreement for arbitration or dispute resolution set forth in the Loan Agreement.

Section 12.     Heirs, Successors and Assigns.   The terms of this Note and of the other Loan Documents shall bind  and  inure  to  the  benefit  of  the  heirs,  devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents.

Section 13. <u>General Provisions.</u> Time is of the essence with respect to Borrower's obligations under this Note. Borrower and each party executing this Note as Borrower hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non exclusive personal jurisdiction of any Court in Michigan; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate to the Loan any and all rights against Borrower and any security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Captions and headings in this Note are for convenience only and shall be disregarded in construing it. This Note and its validity, enforcement and interpretation shall be governed by the laws of the state in which payment of this Note is to be made (without regard to any principles of conflicts of laws) and applicable United States federal law. THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY MICHIGAN LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW. Whenever a time of day is referred to herein, unless otherwise specified such time shall be the local time of the place where payment of this Note is to be made. The term "Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which this Note is payable (excluding Saturdays and Sundays). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement. The words "include" and "including" shall be interpreted as if followed by the words "without limitation."

Section 14. <u>Notices.</u> All Notices required or which any party desires to give hereunder or under any other Loan Document shall be in writing and, unless otherwise specifically provided in such other Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service or

by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any Notice shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein; provided that service of a Notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Note or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason. As used herein, "Notice" means a notice, request, consent, demand or other communication given in accordance with the provisions of this Section.

The address of Borrower is:

LXR BIOTECH, LLC,
4225 N. Atlantic Blvd
Auburn Hills, MI, 48326

The address of Lender is:

BEMO USA WLL (Qatar)
P.O. Box 19584
Doha, Qatar

Section 15. <u>No Usury.</u> It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents. If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Lender's exercise of the option to accelerate the Maturity Date, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note and all other indebtedness secured by the Mortgage, and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and there under reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use or forbearance of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan.

LXR Biotech, LLC
Andrew Krause, Managing Member

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

Witness
John Lee

Section 16. Personal Guaranty of Andrew Krause. The undersigned Andrew Krause absolutely and unconditionally guarantees full and prompt payment of the indebtedness owed by the Borrower to the Lender and the discharge of all obligations of the Borrower to the Lender under this Convertible Promissory Note. This is a guaranty of payment and performance and not collection so that Lender may enforce this guaranty against Andrew Krause without Lender having exhausted its remedies against the Borrower.

Andrew Krause

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

Witness
John Lee

BEMO USA WLL (Qatar)

_____Wade Rowland Dann_____
Name

_____Director_____
Title

# EXHIBIT 6

# CONVERTIBLE
## PROMISSORY NOTE

$600,0000.00                                        June 13 , 2014

FOR VALUE RECEIVED, LXR    LLC,a Michigan limited liability company ("Borrower"), hereby promises to pay to the order of BEMO USA WLL (QATAR) (together with any and all of its successors and assigns and/or any other holder of this Note, "Lender"), without offset, in immediately available funds in lawful money of the United States of America, the principal sum ("the sum") of Six Hundred Thousand Dollars and Zero Cents) ($600,000.00) (or such lesser sum as may have actually advanced by the Lender), together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

Section 1 .    Payment    Schedule    and    Maturity    Date. Subject to the possible conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall be due and payable in full on December 31, 2015 (the "Maturity Date"), the final maturity of this note. Lender shall advance "the sum"on or before June 13, 2014 . Subject to the provision for the conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth below, monthly interest payments shall be due and payable in equal monthly payments beginning on the last day of each month commencing on April 30, 2014. Commencing April 30, 2015, monthly principle and interest payments shall commence so that after 12 monthly payments, the entire principal balance of this Note then unpaid, together with all accrued and unpaid interest and all other amounts payable hereunder, shall be paid in full on or before December 31, 2015 (the "Maturity Date"). Upon receipt of the loan proceeds, Borrower agrees to pay Lender an origination fee in US Dollars of $1,000.00.

Section 2.    Conversion.    The terms of the Pre-Incorporation Agreement (PIA) dated February 26, 2014 between Andrew H. Krause (individually or by nominee) and BEMO USA, WLL (Qatar) is specifically incorporated by reference into this promissory note. Upon fulfillment of all of the conditions in the PIA, including but not limited to, the corporate formation processes, then this Promissory Note will be amended to change the Borrower to LXR Biotech Corporation and LXR Distribution Corporation and Andrew Krause individually and the amount of this promissory note will be considered a capital contribution to the newly created entities in accordance with the terms set forth in the aforementioned PIA.

Section 3.    Interest Rate.

(a)    Annual Interest Rate. The unpaid principal balance of this Note from day to day to day outstanding which is not past due, shall bear interest at eight (8%) percent per anum.

(b)    Past Due Rate. If any amount payable by Borrower i s not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at the rate of ten (10%) per anum.

Section 4.    Prepayment. Borrower may prepay the principal balance of this Note, in full at any time or in part from time to time, without fee, premium or penalty, provided that: (a) Lender shall have actually received from Borrower prior written notice of (i) Borrower's intent

to prepay, (ii) the amount of principal which will be prepaid (the "Prepaid Principal"), and (iii) the date on which the prepayment will be made.

Section 5.    Late Charges. If Borrower shall fail to make any payment under the terms of this Note (other than the payment due at maturity) within fifteen (15) days after the date such payment is due, Borrower shall pay to Lender on demand a late charge equal to two percent (2%) of the amount of such payment. Such fifteen (15) day period shall not be construed as in any way extending the due date of any payment. The late charge is imposed for the purpose of defraying the expenses of Lender incident to handling such delinquent payment. This charge shall be in addition to, and not in lieu of, any other amount that Lender may be entitled to receive or action that Lender may be authorized to take as a result of such late payment.

Section 6.    Certain Provisions Regarding Payments. All payments made under this Note shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest, to unpaid principal, and to any other sums due and unpaid to Lender under the Loan Documents, in such manner and order as Lender may elect in its sole discretion, any instructions from Borrower or anyone else to the contrary notwithstanding. Remittances shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and shall be accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect. Payments received after 2:00 p.m. shall be deemed to be received on, and shall be posted as of, the following Business Day.  Whenever any payment under this Note or any other Loan Document falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

Section 7.    Events of Default. The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

(a)    Borrower fails to pay when and as due and payable any amounts payable by Borrower to Lender under the terms of this Note.

(b)    Any covenant, agreement or condition in this Note is not fully and timely performed, observed or kept, subject to any applicable grace or cure period.

Section 8.     Remedies.  Upon  the  occurrence  of  an  Event  of  Default,  Lender  may  at any time thereafter exercise any one or more of the following rights, powers and remedies:

(a)     Lender  may  accelerate  the  Maturity  Date  and  declare  the  unpaid  principal balance  and  accrued  but  unpaid  interest  on  this  Note,  and  all  other  amounts  payable  hereunder and  under  the  other  Loan  Documents,  at  once  due  and  payable,  and  upon  such  declaration  the same shall at once be due and payable.

(b)     Lender  may  set  off  the  amount  due  against  any  and  all  accounts,  credits, money,  securities  or  other  property  now  or  hereafter  on  deposit  with,  held  by  or  in  the  possession of  Lender  to  the  credit  or  for  the  account  of  Borrower,  without  notice  to  or  the  consent  of Borrower.

(c)     Lender  may  exercise  any  of  its  other  rights,  powers  and  remedies  under the Loan Documents or at law or in equity.

Section 9.     Remedies Cumulative.  All  of  the  rights  and  remedies  of  Lender  under  this Note  are  cumulative  of  each  other  and  of  any  and  all  other  rights  at  law  or  in  equity,  and  the exercise  by  Lender  of  any  one  or  more  of  such  rights  and  remedies  shall  not  preclude  the simultaneous  or  later  exercise  by  Lender  of  any  or  all  such  other  rights  and  remedies.  No  single  or partial  exercise  of  any  right  or  remedy  shall  exhaust  it  or  preclude  any  other  or  further  exercise thereof,  and  every  right  and  remedy  may  be  exercised  at  any  time  and  from  time  to  time.  No failure  by  Lender  to  exercise,  nor  delay  in  exercising,  any  right  or  remedy  shall  operate  as  a  waiver of such right or remedy or as a waiver of any Event of Default.

Section 10.     Costs and Expenses of Enforcement.  Borrower agrees to pay to Lender on demand  all  costs  and  expenses  incurred  by  Lender  in  seeking  to  collect  this  Note  or  to  enforce any  of  Lender's  rights  and  remedies  under  the  Loan  Documents,  including  court  costs  and reasonable  attorneys'  fees  and  expenses,  whether  or  not  suit  is  filed  hereon,  or  whether  in connection with bankruptcy, insolvency or appeal.

Section 11.  Service of Process.  Borrower  hereby  consents  to  process  being  served  in any  suit,  action,  or  proceeding  instituted  in  connection  with  this  Note  by  (a)  the  mailing  of  a copy  thereof  by  certified  mail,  postage  prepaid,  return  receipt  requested,  to  Borrower  and  (b) serving  a  copy  thereof  upon  Andrew  Krause,  the  agent  hereby  designated  and  appointed  by Borrower  as  Borrower's  agent  for  service  of  process.  Borrower  irrevocably  agrees  that  such service  shall  be  deemed  to  be  service  of  process  upon  Borrower  in  any  such  suit,  action,  or proceeding.  Nothing  in  this  Note  shall  affect  the  right  of  Lender  to  serve  process  in  any  manner otherwise  permitted  by  law  and  nothing  in  this  Note  will  limit  the  right  of  Lender  otherwise  to bring  proceedings  against  Borrower  in  the  courts  of  any  jurisdiction  or  jurisdictions,  subject  to any  provision  or  agreement  for  arbitration  or  dispute  resolution  set  forth  in  the  Loan  Agreement.

Section 12.     Heirs, Successors and Assigns.  The  terms  of  this  Note  and  of  the other  Loan  Documents  shall  bind  and  inure  to  the  benefit  of  the  heirs,  devisees, representatives,  successors  and  assigns  of  the  parties.  The  foregoing  sentence  shall  not  be construed  to  permit  Borrower  to  assign  the  Loan  except  as  otherwise  permitted  under  the  Loan Documents.

Section 13.   General Provisions.  Time is of the essence with respect to Borrower's obligations under this Note. Borrower and each party executing this Note as Borrower hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non exclusive personal jurisdiction of any Court in Michigan; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate to the Loan any and all rights against Borrower and any security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Captions and headings in this Note are for convenience only and shall be disregarded in construing it. This Note and its validity, enforcement and interpretation shall be governed by the laws of the state in which payment of this Note is to be made (without regard to any principles of conflicts of laws) and applicable United States federal law. THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY MICHIGAN LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW. Whenever a time of day is referred to herein, unless otherwise specified such time shall be the local time of the place where payment of this Note is to be made. The term "Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which this Note is payable (excluding Saturdays and Sundays). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement. The words "include" and "including" shall be interpreted as if followed by the words "without limitation."

Section 14.   Notices.   All Notices required or which any party desires to give hereunder or under any other Loan Document shall be in writing and, unless otherwise specifically provided in such other Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service or

by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any Notice shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein; provided that service of a Notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Note or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason. As used herein, "Notice" means a notice, request, consent, demand or other communication given in accordance with the provisions of this Section.

The address of Borrower is:

LXR BIOTECH, LLC,
4225 N. Atlantic Blvd
Auburn Hills, MI. 48326

The address of Lender is:

BEMO USA WLL (Qatar)
P.O. Box 19584
Doha, Qatar

Section 15. No Usury. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents. If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Lender's exercise of the option to accelerate the Maturity Date, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Lender' s express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note and all other indebtedness secured by the Mortgage, and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and there under reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use or forbearance of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan.

_____

LXR Biotech, LLC
Andrew Krause, Managing Member

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

_____

Witness
John Lee

Section 16. <u>Personal Guaranty of Andrew Krause.</u>  The undersigned Andrew Krause absolutely and unconditionally guarantees full and prompt payment of the indebtedness owed by the Borrower to the Lender and the discharge of all obligations of the Borrower to the Lender under this Convertible Promissory Note.  This is a guaranty of payment and performance and not collection so that Lender may enforce this guaranty against Andrew Krause without Lender having exhausted its remedies against the Borrower.

_____

Andrew Krause

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

_____

Witness
John Lee


_____

BEMO USA WLL (Qatar)

____Wade Rowland Dann_____
Name

____Director_____
Title

# EXHIBIT 7

# CONVERTIBLE
# PROMISSORY NOTE

$888.59                                        October 13 , 2014

     FOR VALUE RECEIVED, LXR      LLC,a Michigan limited liability company
("Borrower"), hereby promises to pay to the order of BEMO USA WLL (QATAR) (together
with any and all of its successors and assigns and/or any other holder of this Note, "Lender"),
without offset, in immediately available funds in lawful money of the United States of
America, the principal sum ("the sum") of Eight Hundred EightyEight Dollars and
59 Cents) ($888.59) (or such lesser sum as may have actually advanced by the Lender),
together with interest on the unpaid principal balance of this Note from day to day
outstanding as hereinafter provided.

     Section 1 .    Payment    Schedule    and    Maturity    Date. Subject to the
conversion of a portion of this indebtedness into a 20% equity ownership in Borrower as set forth
below, the entire principal balance of this Note then unpaid, together with all accrued and unpaid
interest and all other amounts payable hereunder, shall be due and payable in full on December
31, 2015 (the "Maturity Date"), the final maturity of this note. Lender shall advance "the sum"on
or before June 13, 2014 . Subject to the provision for the conversion of a portion of this indebtedness
into a 20% equity ownership in Borrower as set forth below, monthly interest payments shall be due
and payable in equal monthly payments beginning on the last day of each month
commencing on December 31, 2014. Commencing April 30, 2015, monthly principle and interest
payments shall commence so that after 12 monthly payments, the entire principal balance of this
Note then unpaid, together with all accrued and unpaid interest and all other amounts payable
hereunder, shall be paid in full on or before December 31, 2015 (the "Maturity Date"). Upon receipt
of the loan proceeds, Borrower agrees to pay Lender an origination fee in US Dollars of $1,000.00.

     Section 2.      Conversion.     The terms of the Pre-Incorporation Agreement (PIA) dated
February 26, 2014 between Andrew H. Krause (individually or by nominee) and BEMO USA, WLL
(Qatar) is specifically incorporated by reference into this promissory note. Upon fulfillment of all of
the conditions in the PIA, including but not limited to, the corporate formation processes, then this
Promissory Note will be amended to change the Borrower to LXR Biotech Corporation and LXR
Distribution Corporation and Andrew Krause individually and the amount of this promissory note
will be considered a capital contribution to the newly created entities in accordance with the terms set
forth in the aforementioned PIA.

     Section 3.      Interest Rate.

     (a)      Annual Interest Rate. The unpaid principal balance of this Note from day to
day to day outstanding which is not past due, shall bear interest at eight (8%) percent per anum.

     (b)      Past Due Rate. If any amount payable by Borrower i s not paid when
due (without regard to any applicable grace periods), such amount shall thereafter bear
interest at the rate of ten (10%) per anum.

     Section 4.      Prepayment.  Borrower may prepay the principal balance of this Note, in
full at any time or in part from time to time, without fee, premium or penalty, provided that: (a)
Lender shall have actually received from Borrower prior written notice of (i) Borrower's intent

to prepay, (ii) the amount of principal which will be prepaid (the "Prepaid Principal"), and (iii) the date on which the prepayment will be made.

Section 5. **Late Charges.** If Borrower shall fail to make any payment under the terms of this Note (other than the payment due at maturity) within fifteen (15) days after the date such payment is due, Borrower shall pay to Lender on demand a late charge equal to two percent (2%) of the amount of such payment. Such fifteen (15) day period shall not be construed as in any way extending the due date of any payment. The late charge is imposed for the purpose of defraying the expenses of Lender incident to handling such delinquent payment. This charge shall be in addition to, and not in lieu of, any other amount that Lender may be entitled to receive or action that Lender may be authorized to take as a result of such late payment.

Section 6. **Certain Provisions Regarding Payments.** All payments made under this Note shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest, to unpaid principal, and to any other sums due and unpaid to Lender under the Loan Documents, in such manner and order as Lender may elect in its sole discretion, any instructions from Borrower or anyone else to the contrary notwithstanding. Remittances shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and shall be accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect. Payments received after 2:00 p.m. shall be deemed to be received on, and shall be posted as of, the following Business Day. Whenever any payment under this Note or any other Loan Document falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

Section 7. **Events of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

(a) Borrower fails to pay when and as due and payable any amounts payable by Borrower to Lender under the terms of this Note.

(b) Any covenant, agreement or condition in this Note is not fully and timely performed, observed or kept, subject to any applicable grace or cure period.

Section 8.    Remedies. Upon the occurrence of an Event of Default, Lender may at any time thereafter exercise any one or more of the following rights, powers and remedies:

(a)    Lender may accelerate the Maturity Date and declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts payable hereunder and under the other Loan Documents, at once due and payable, and upon such declaration the same shall at once be due and payable.

(b)    Lender may set off the amount due against any and all accounts, credits, money, securities or other property now or hereafter on deposit with, held by or in the possession of Lender to the credit or for the account of Borrower, without notice to or the consent of Borrower.

(c)    Lender may exercise any of its other rights, powers and remedies under the Loan Documents or at law or in equity.

Section 9.    Remedies Cumulative. All of the rights and remedies of Lender under this Note are cumulative of each other and of any and all other rights at law or in equity, and the exercise by Lender of any one or more of such rights and remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other rights and remedies. No single or partial exercise of any right or remedy shall exhaust it or preclude any other or further exercise thereof, and every right and remedy may be exercised at any time and from time to time. No failure by Lender to exercise, nor delay in exercising, any right or remedy shall operate as a waiver of such right or remedy or as a waiver of any Event of Default.

Section 10.    Costs and Expenses of Enforcement. Borrower agrees to pay to Lender on demand all costs and expenses incurred by Lender in seeking to collect this Note or to enforce any of Lender's rights and remedies under the Loan Documents, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with bankruptcy, insolvency or appeal.

Section 11.    Service of Process. Borrower hereby consents to process being served in any suit, action, or proceeding instituted in connection with this Note by (a) the mailing of a copy thereof by certified mail, postage prepaid, return receipt requested, to Borrower and (b) serving a copy thereof upon Andrew Krause, the agent hereby designated and appointed by Borrower as Borrower's agent for service of process. Borrower irrevocably agrees that such service shall be deemed to be service of process upon Borrower in any such suit, action, or proceeding. Nothing in this Note shall affect the right of Lender to serve process in any manner otherwise permitted by law and nothing in this Note will limit the right of Lender otherwise to bring proceedings against Borrower in the courts of any jurisdiction or jurisdictions, subject to any provision or agreement for arbitration or dispute resolution set forth in the Loan Agreement.

Section 12.    Heirs, Successors and Assigns. The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents.

Section 13.   General Provisions.  Time is of the essence with respect to Borrower's obligations under this Note. Borrower and each party executing this Note as Borrower hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non exclusive personal jurisdiction of any Court in Michigan; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate to the Loan any and all rights against Borrower and any security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Captions and headings in this Note are for convenience only and shall be disregarded in construing it. This Note and its validity, enforcement and interpretation shall be governed by the laws of the state in which payment of this Note is to be made (without regard to any principles of conflicts of laws) and applicable United States federal law. THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY MICHIGAN LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW. Whenever a time of day is referred to herein, unless otherwise specified such time shall be the local time of the place where payment of this Note is to be made. The term "Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which this Note is payable (excluding Saturdays and Sundays). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement. The words "include" and "including" shall be interpreted as if followed by the words "without limitation."

Section 14.   Notices.   All Notices required or which any party desires to give hereunder or under any other Loan Document shall be in writing and, unless otherwise specifically provided in such other Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service or



by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any Notice shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein; provided that service of a Notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Note or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason. As used herein, "Notice" means a notice, request, consent, demand or other communication given in accordance with the provisions of this Section.

The address of Borrower is:

LXR BIOTECH, LLC.
4225 N. Atlantic Blvd
Auburn Hills, MI. 48326

The address of Lender is:

BEMO USA WLL (Qatar)

P.O. Box 19584

Doha, Qatar

Section 15.    No Usury.    It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents. If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Lender's exercise of the option to accelerate the Maturity Date, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note and all other indebtedness secured by the Mortgage, and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and there under reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use or forbearance of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan.



LXR Biotech, LLC
Andrew Krause, Managing Member

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

Witness
John Lee

Section 16. Personal Guaranty of Andrew Krause. The undersigned Andrew Krause absolutely and unconditionally guarantees full and prompt payment of the indebtedness owed by the Borrower to the Lender and the discharge of all obligations of the Borrower to the Lender under this Convertible Promissory Note. This is a guaranty of payment and performance and not collection so that Lender may enforce this guaranty against Andrew Krause without Lender having exhausted its remedies against the Borrower.

Andrew Krause

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

Witness
John Lee

BEMO USA WLL (Qatar)

____Wade Rowland Dann____
Name

____Director____
Title

# EXHIBIT 8

# PRE-INCORPORATION AGREEMENT

On February 26 , 2014, Andrew H. Krause (individually or by nominee) and BEMO USA WLL (QATAR) (together referred to as "Shareholders") agree to the following:

### 1. *Incorporation*

A corporation named "LXR BIOTECH CORPORATION" will be organized under Delaware law and operated in the State of Michigan. The proposed articles of incorporation are attached as Exhibit A. Andrew H. Krause will be designated as resident agent. Andrew H. Krause will sign the articles of incorporation as the incorporator.

A corporation named "LXR DISTRIBUTION CORPORATION" will be organized under Delaware law and operated in the State of Michigan. The proposed articles of incorporation are attached as Exhibit B. Andrew H. Krause will be designated as resident agent. Andrew H. Krause will sign the articles of incorporation as the incorporator.

On December 19, 2013, the parties prepared and signed a Memorandum of Understanding. The terms and conditions of that document are incorporated within this Pre-incorporation Agreement. A copy of this document is attached hereto and referred to as Exhibit C. Further, the parties acknowledge that Andrew H. Krause is the 100% owner of the membership interest in LXR Distributing, LLC (a Michigan limited liability company), and LXR Biotech, LLC (a Michigan limited liability company) and he desires to contribute these interests to obtain his 80% Shareholder interest in the new corporations.

### 2. *Corporate Purpose*

The articles of incorporation will allow the corporations to engage in any activity within the purposes for which corporations may be formed under Delaware law and adopted by Michigan law.

### 3. *Capitalization*

Each corporation shall have a single class of capital stock, consisting of 60,000 shares. The stock will not have preemptive rights. All shares shall have equal rights and shall be entitled to vote on all matters submitted to Shareholders. The articles of incorporation provide that no additional shares shall be authorized for issuance without the unanimous written consent of each Shareholder.

BEMO USA, WLL has initially lent to the corporations $1,834,111.41 and received a Convertible Promissory Note and Guaranty from Andrew H. Krause in the form attached as Exhibit D. The Shareholders agree that upon transfer of the assets into the new corporations, then this Convertible Promissory Note and Guaranty will be amended to change the Borrower to LXR Biotech Corporation and LXR Distribution Corporation and

1

 

that Andrew H. Krause will continue to Guarantee the Promissory Note. With regard to this $1,834,111.41 Convertible Promissory Note, the Shareholders further agree that if by December 31, 2014, the new Corporations and LXR Biotech, LLC have a combined Net Income, before taxes, of $8,064,744.00 or greater, then the Loan Proceeds of $1,834,111.41 will be converted to equity or Shareholder Interest and the Note will be considered paid in full to Andrew H. Krause and the new Company. Net Income, as used within the agreement herein, shall be defined as the combination of the Net Income received by the newly created corporations (LXR Biotech Corporation and LXR Distribution Corporation) and the predecessor LXR Bioetch, LLC.

After these new entities are established, the Convertible Promissory Note and Guaranty (Exhibit D) will be amended to add LXR Biotech Corporation and LXR Distribution Corporation as obligors.

Further, subject to the terms and conditions of this Agreement, the parties also agree to the following:

(a)     Based upon the satisfaction of the conditions precedent for the additional Capital Contributions set forth in 3(b)(ii) and (iii) below, BEMO USA, WLL (Qatar) agrees in the form of loans and capital contributions to fund up to USD$5,000,000.00. In consideration thereof, Andrew H. Krause (individually), LXR Distributing, LLC (a Michigan limited liability company) and LXR Biotech, LLC (a Michigan limited liability company), agree to provide BEMO USA WLL (QATAR) with 20% Stockholder Interest in LXR Biotech Corporation, LXR Distribution Corporation, and other companies per paragraph (g) below;

(b)     The Equity Investment shall be paid out only if the conditions are met as follows:

(i) On or before March 3, 2014, the execution of the convertible promissory note in the amount of USD$1,600,000.00 as set forth as Exhibit P attached hereto and incorporated by reference;

(ii) On or before March 31, 2014, payment of $800,000.00 upon the verification by BEMO USA WLL (QATAR) that the purchase orders for CVS equals at least 600,000 units, the purchase orders for Dollar Tree equals at least 280,000 units, purchase orders for Family Dollar equals at least 800,000 units, and the purchase orders for Eurpac equals at least 1,080,000 units (funding is delayed until the confirmation of the above or a combination of purchase orders from the preceding or any new customers totaling the additional 2,760,000 units); and

(iii) On or before April 30, 2014, payment of $800,000.00 upon the verification by BEMO USA WLL (QATAR) that the purchase orders for Walmart equals at least 1,100,000 units, the purchase orders for CVS equals at least 250,000 units, the purchase orders for Dollar Tree equals at least 280,000 units, purchase orders for

2

 

Family Dollar equals at least 900,000 units, and the purchase orders for Eurpac equals at least 1,080,000 units (funding is delayed until the confirmation of the above or a combination of purchase orders from the preceding or any new customers totaling the additional 3,610,000 units which is in addition to the 2,760,000 units from 3 (b) (ii)).

Again, the parties agree and understand that if the conditions set forth in section 3(b)(ii) and (iii) are not met, then BEMO USA WLL (QATAR) will have no obligation to further fund any more capital contributions.  Notwithstanding, section 3 above, BEMO USA WLL (QATAR) will have shareholder interest of 20%.

(c)     That the new Corporations shall procure "Key Man" Insurance for Andrew H. Krause in an amount to be agreed upon by the parties;

(d)     That the Shareholders will discuss and agree, in advance, to any extraordinary expenses;

(e)     That there shall <u>not</u> be the issuance or sale of any additional shares of stock that would dilute any of the Shareholders percentage of ownership;

(f)     That for a period of <u>60</u> days, BEMO USA WLL (QATAR) has a right of first refusal concerning the sale of any stock or membership units owned by Andrew H. Krause (individually) in any business entity related to the packaging, bottling and/or selling of drinkable liquid, including but not limited to, LXR Distributing, LLC (a Michigan limited liability company) and LXR Biotech, LLC (a Michigan limited liability company);

(g)     That Andrew H. Krause (individually), LXR Distributing, LLC (a Michigan limited liability company), and LXR Biotech, LLC (a Michigan limited liability company) will give BEMO USA WLL (QATAR) a 20% interest in any and all other ventures related to the packaging, bottling and/or selling of drinkable liquid, including LXR Distributing, LLC, Eternal Energy, LLC, and/or any related company;

(h)     That Andrew H. Krause (individually), LXR Distributing, LLC (a Michigan limited liability company) and LXR Biotech, LLC (a Michigan limited liability company) will provide BEMO USA WLL (QATAR) with a legal opinion regarding threatening or pending litigation related to Andrew H. Krause, LXR Distributing, LLC, LXR Biotech, LLC, Eternal Energy, LLC, and/or any related company; and

(i)     That Andrew H. Krause (individually), LXR Distributing, LLC and LXR Biotech, LLC (a Michigan limited liability company) will provide total access to BEMO USA WLL (QATAR) of all books, records, and accounting information regarding the new corporations on an ongoing and continuous basis throughout the

 

3

==highlight==**term of Andrew H. Krause and/or BEMO USA WLL (QATAR) owning any stock or membership units.**

The aggregate combination of the two Convertible Promissory Notes plus the amounts set forth in 3(b)(i) and (ii) shall not exceed USD$5,000,000.00.

4. *Incorporator's Subscriptions*

Each Shareholder subscribes for the following percentage of shares of common stock and agrees to pay the total purchase price required in cash or property promptly following incorporation and the delivery of a stock certificate:

| | Total % of Shares of | Purchase Price | |
|---|---|---|---|
| *Name* | *Common Stock* | *Cash* | *Property* |
| Andrew H. Krause | 80% | | TBD |
| BEMO USA WLL (QATAR) | 20% | TBD | |

Each Shareholder represents that they are purchasing the shares for their own account for investment purposes and not for resale, and each agrees not to sell the shares unless they are registered under the securities laws or the sale is exempt from registration, in the opinion of legal counsel for the corporation.

5. *Transfer of Assets and Liabilities*

Subject to a final review of the books, records and physical inventory concerning all assets related to Andrew Krause's involvement in the shot and beverage industry, Andrew H. Krause (or his nominee) shall pay for his subscribed shares by transferring to the corporations the assets of both LXR Biotech, LLC (a Michigan limited liability company) and LXR Distributing, LLC (a Michigan limited liability company), as described on the attached Exhibits E and F. The corporations shall also assume the liabilities shown on Exhibits E and F. All contracts to be assigned were entered into by LXR Biotech, LLC in contemplation of the formation of the corporation. The corporation shall assume all of the obligations under the contracts. Upon the request of either shareholder, separate and individual purchase orders shall be assigned to any of the new corporations being formed.

Each Shareholder will be a director of the corporations and agrees that the assets (minus liabilities) to be transferred by Andrew H. Krause (individually), LXR Biotech, LLC (a Michigan limited liability company), LXR Distributing, LLC (a Michigan limited liability company) (or his nominee LXR Biotech, LLC) have a value, including goodwill, of at least USD$5,000,000.00.

4

 

Further, the parties agree the businesses named (1) Eternal Energy, LLC, (2) LXR Laboratories, LLC, (3) LXR Manufacturing, Inc., (4) LXR Pharmaceuticals, LLC, and (5) LXR Technology, LLC are Michigan limited liability companies owned 100% by Andrew H. Krause. Eternal Energy, LLC is the owner of the assumed names of Eternal Energy and Eternal Energy Shot. These assumed names shall be transferred to the new corporation LXR Biotech Corporation. Apart from the assumed names, Andrew H. Krause agrees that all of these LLC do not have any assets or liabilities. They are businesses in name only.

*6. Section 1244 Stock*

The shares shall be issued pursuant to section 1244 of the Internal Revenue Code.

*7. Board of Directors*

The initial board of directors for each corporation shall consist of the Shareholders or an authorized representative appointed by Shareholder.

*8. Corporate Officers*

The officers of each corporation shall be as follows:

| *Name* | *Position* |
| --- | --- |
| Andrew H. Krause | President |
| John Lee | Treasurer / Secretary |

*9. Initial Place of Business*

The corporations shall maintain their initial principal office at 4225 N. Atlantic Blvd., Auburn Hills, Michigan 48326.

*10. Bylaws*

Attached, as Exhibits G and H, are the bylaws for each corporation that are to be submitted for approval by the boards of directors. The bylaws, among other things, provide for indemnification of officers and directors to the full extent allowed under Delaware and Michigan law, the unanimous vote of the directors for certain director actions, and the signature of two Shareholders for certain corporate actions to occur.

*11. Employment Contracts*

Andrew H. Krause and John Lee shall be employees of the corporations and shall enter into the employment agreements. The forms to be utilized are attached as Exhibit I and J.



## 12. *Confidential Information and Invention Agreement*

Each Shareholder shall sign and cause other employees and persons associated with the corporation to sign a confidential information and invention agreement in the form attached as Exhibit K.

## 13. *Subchapter-S Election*

The corporation shall <u>not</u> file an election to be treated as an S corporation under IRC 1362(a). Each Shareholder also agrees not to transfer his or her stock (or take any other action) in a manner.

## 14. *Shareholder Agreement*

For each corporation, the Shareholders shall sign a shareholder agreement in the form attached as Exhibits L and M concerning restrictions on the transfer of stock and provisions to buy and sell on certain events.

## 15. *Shareholder Voting Agreement*

For each corporation, the Shareholders shall sign a shareholder voting agreement in the attached as Exhibits N and O, which includes an agreement to vote the stock so that each Shareholder serves on the board of directors.

## 16. *Ratification and Adoption*

Each Shareholder shall vote his or her shares to cause the corporation to adopt and ratify this agreement and to enter into the agreements attached as exhibits.

## 17. *Other*

This agreement shall be binding on each Shareholder and his or her legal representatives, heirs, and assigns.

## 18. *Waiver of Conflict*

The Shareholders acknowledge that the attorney who has prepared and will prepare all of the transactional documents is Scott Ausilio, Ausilio Law Group (the Attorney), who has informed the Shareholders that a conflict exists and more specifically that

    (a) Shareholders have been advised that on previous occasions the Attorney has represented Andrew H. Krause, Gary L. Krause, and their respective business entities;

    (b) Shareholders have been advised by the Attorney that a conflict exists among their individual interests;

6



Case 2:18-cv-10074-SFC-EAS ECF No. 1-4 filed 01/10/18 PageID.83 Page 73 of 112

(c) Shareholders have been advised by the Attorney to seek the advice of independent counsel;

(d) Shareholders have had the opportunity to seek the advice of independent counsel;

(e) Shareholders have received no representations from the Attorney about the tax consequences of this Agreement;

(f) Shareholders have been advised by the Attorney that this Agreement may have tax consequences;

(g) Shareholders have been advised by the Attorney to seek the advice of independent tax counsel; and

(h) Shareholders have had the opportunity to seek the advice of independent tax counsel.

This Agreement was executed on the dates set forth below and was effective as of December 19, 2013 by the following prospective shareholders:

Dated: _____, 2014

_____
By: Andrew H. Krause (individually)

Dated: _____, 2014

_____
By: Andrew H. Krause, as sole Member and Manager for LXR Biotech, LLC

Dated: _____, 2014

_____
By: Andrew H. Krause, as sole Member and Manager for LXR Distributing, LLC

Dated: _____, 2014

_____
By: Wade Rowland Dann, Director
BEMO USA, WLL (Qatar)

7

Adopted and Ratified:
LXR BIOTECH CORPORATION, a Delaware corporation

By: _____
Andrew H. Krause, President



Adopted and Ratified:
LXR DISTRIBUTION CORPORATION, a Delaware corporation

By: _____
Andrew H. Krause, President

8



## Exhibit List

(A)   Articles of Incorporation for LXR Biotech Corporation

(B)   Articles of Incorporation for LXR Distribution Corporation

(C)   Memorandum of Understanding dated December 19, 2013

(D)   Convertible Promissory Note and Guaranty for Initial $1,834,111.41 Loan

(E)   Andrew H. Krause (individually) and LXR Biotech, LLC (a Michigan limited liability company) Assignment of Assets

(F)   Andrew H. Krause (individually) and LXR Distributing, LLC (a Michigan limited liability company) Assignment of Assets

(G)   Bylaws for LXR Biotech Corporation

(H)   Bylaws for LXR Distribution Corporation

(I)   Employment Contract of Andrew H. Krause

(J)   Employment Contract of John Lee

(K)   Confidential Information and Invention Agreement

(L)   Shareholder Agreement for LXR Biotech Corporation

(M)   Shareholder Agreement for LXR Distribution Corporation

(N)   Shareholder Voting Agreement for LXR Biotech Corporation

(O)   Shareholder Voting Agreement for LXR Distribution Corporation

(P)   Convertible Promissory Note and Guaranty for $1,600,000.00 Loan

9

# EXHIBIT 9

**STATE OF MICHIGAN**
**OAKLAND COUNTY CIRCUIT COURT**

STRATEGY AND EXECUTIONS, INC.,          Case No. 2015-146756-CK
a Michigan corporation,                          Hon. Wendy Potts

                Plaintiff/Counter-Defendant,

-v-

LXR BIOTECH, LLC,
a Michigan limited liability company,

                Defendant/Counter-Plaintiff.

_____/

**AFFIDAVIT OF RICHARD E. KOVACH**

STATE OF ARIZONA

COUNTY OF MARICOPA

      Affiant, Richard E. Kovach, being first duly sworn, deposes and states:

    1.      That I am a shareholder of Defendant/Counter-Plaintiff LXR BIOTECH, LLC.

    2.      In late December 2014 and thereafter, LXR, through its President Andrew Krause, and myself had discussed a possible infusion of capital in exchange for equity and/or debt financing for LXR by a transaction from myself through one of my entities.   At this time, LXR needed the money and I was interested in increasing my stake in the company.

    3.      These discussions were elevating and I wanted to know more details of the company's operations. Tom Morse, came to Arizona to meet with myself and my representatives.

4.     Tom Morse, told me about the sales and customers of the business and what the future plans were.  Hearing management's plans convinced me to think further about an investment in the company. Tom Morse seemed to understand where the company was going, since he told me that he managed sales.

5.     After this meeting, discussions continued.  Tom Morse and I discussed structuring a transaction as a capital infusion to the company, as a condition to a closing, I informed Tom Morse that a change of top management would need to take place.

6.     In or around approximately March 2015, Tom Morse flew out to Arizona again to meet with myself and my representatives, as I wanted more information on his final plans to lead the company's sales program. The discussions centered around the inability of the current management to lead the company forward under his current sales plan. Based upon the previous 18 months of company results I agreed with Tom Morse that a management change needed to take place. Tom Morse indicated he felt he could lead the company into a profitable position and increase the value of the equity in the company. Tom Morse also agreed with me that the management must change before a further investment should be made.

7.     After Tom Morse left Arizona myself and my associates had a few more conversations to discuss how the company would look moving forward.

8.     A plan was presented to Andy Krause regarding a significant investment requiring a management change and he declined. At which point I felt the investment opportunity was too risky and I declined.

9.     Subsequently Tom Morse informed me that if I was interested he could form a group of creditors to force LXR Biotech into bankruptcy. The plan included Tom Morse taking

2

over as the President. Tom Morse referred me to an attorney with whom Tom Morse had discussed this plan.

10.    I have personal knowledge of the facts contained within this Affidavit and can testify competently thereto if called as a witness.

    FURTHER AFFIANT SAYETH NOT.

                                        RICHARD E. KOVACH

                                        _____
                                        By:  Richard E. Kovach
                                        Affiant

Subscribed to and sworn to before me
this 28th day of January, 2016.
_____
Notary Public, Maricopa County, AZ
My commission expires:  1 - 2 - 2020
Acting In: Scottsdale, AZ

A. JONES
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
January 2, 2020

3

# EXHIBIT 10

Received for Filing Oakland County Clerk 2017 APR 06 AM 09:05

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

STRATEGY AND EXECUTION, INC.,
a Michigan corporation,

   Plaintiff,

v           Case No. 2015-146756-CK

LXR BIOTECH, LLC, a Michigan
limited liability company,

   Defendant.     /
_____

JURY TRIAL - VOLUME 6 OF 8

BEFORE THE HONORABLE WENDY L. POTTS, CIRCUIT JUDGE

Pontiac, Michigan - Tuesday, November 1, 2016

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | ZACHARY B. MACK (P62742)<br>Law Offices of Zackary B. Mack, PLLC<br>1370 N. Oakland Boulevard, Suite 110<br>Waterford, Michigan 48327<br>(248) 904-0935 |
| For the Defendant: | THOMAS H. STIDHAM (P56504)<br>Law Offices of Thomas H. Stidham<br>1401 W. Fort Street, Unit 44-1815<br>Detroit, Michigan 48244<br>(248) 303-0306 |
| Transcript Provided by: | Accurate Transcription Services, LLC<br>Firm # 8493<br>(734)944-5818 |
| Transcribed by: | Sharon Fry, CER #8091 |

L001084

Received for Filing Oakland County Clerk 2017 APR 06 AM 09:05

TABLE OF CONTENTS

PAGE

WITNESSES:   (FOR THE DEFENDANT):

WADE DANN

Direct Examination by Mr. Stidham........................... 6
Cross-Examination by Mr. Mack.............................. 48
Examination by the Court.................................. 94
Recross-Examination by Mr. Mack........................... 95


EXHIBITS                                           RECEIVED

DX FF - Two Emails........................................ 30
DX GG - Email and Promissory Notes........................ 29
DX JJ - Email............................................. 25

PX #138 - Email........................................... 77
PX #139 - Email........................................... 83
PX #149 - Statement....................................... 64
PX #165 - Billing Statement............................... 67

L001085

Received for Filing Oakland County Clerk 2017 APR 06 AM 09:05

1    Sollish was -- kept hustling me for and even after Tom --

2    even after Tom backed out he was still -- he still wanted

3    me to pursue this involuntary bankruptcy.

4  Q   Why?  Okay.  Do you know how much money in April of 2017

5    or excuse me 2015 LXR owed to that point to my client?

6    How much money did they owe BEMO?

7  A   Nothing.

8  Q   They didn't owe you anything?

9  A   We had -- we had promissory notes, okay, that converted to

10   equity.

11 Q   Okay.  Well you say in your email to Wade Dann which is GG

12   in front of you or to Ron Sollish:

13             "Neither the origination fee or the

14       interest is being paid.  Interest is not being paid

15       on both of the notes."

16   Wasn't interested owed at that point?

17 A   The interest -- the interest -- take a look at the

18   promissory notes, but I think the interest wraps into the

19   note.

20 Q   Okay.  Meaning what?  That it just continues to accumulate

21   and accumulate?

22 A   Yeah, I mean --

23 Q   And --

24 A   -- I mean where -- I mean we're out five million dollars

25   plus interest and origination fee.  And the reason I was

72

L001155

Received for Filing Oakland County Clerk 2017 APR 06 AM 09:05

1      telling Sollish that is -- I don't know what date that is,

2      but in the -- in the involuntary bankruptcy we -- you know

3      he needed to know that to determine what kind of interest

4      we would have in any new corporation.

5   Q  It looks like this note from the exhibits says it's due

6      and payable, one million eight hundred thirty-four

7      thousand some change is due and payable on or before

8      December 31, 2015.  Did that get paid?

9   A  Well you got to keep reading.

10  Q  Well I'm just asking did it get paid?

11  A  Well keep reading.  No, it didn't get paid, but then it

12     converts to equity.

13  Q  All right.  So we talked about that.  On paper you're

14     twenty percent owner, but you're not sure --

15  A  Twenty-five percent.

16  Q  Twenty-five percent owner.  Okay.  May I approach the

17     witness, your Honor?

18                 THE COURT:  You may.

19  BY MR. MACK:

20  Q  So you never had an attorney/client relationship around

21     Sollish, is that correct?

22  A  If you -- if you define attorney/client as me sending him

23     documents, privileged documents that I don't -- that it's

24     part of this involuntary bankruptcy and whatever, I did

25     not want him to disclose to third parties, yes.

73

# EXHIBIT 11

## UNITED STATES OF AMERICA
## IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEMO USA, WLL (QATAR),
    Plaintiff,

v.

LXR BIOTECH, LLC,
LXR DISTRIBUTING, LLC,
ETERNAL ENERGY, LLC,
LXR BIOTECH CORPORATION,
LXR DISTRIBUTION CORPORATION,
ANDREW KRAUSE,
and
JOHN AND JANE DOES,

    Defendants.

Case No. 18-cv-10674

Hon. Sean F. Cox
Magistrate Judge Elizabeth A. Stafford

---

McDONALD TINKER PA
By: Corey M. Adams, #27253
300 W. Douglas, Suite 500
Wichita, KS 67202
(316) 263-5851
cadams@mcdonaldtinker.com

SILVERMAN & MORRIS PLLC
By: Thomas R. Morris (P39141)
30500 Northwestern Highway, Suite 200
Farmington Hills, MI 48334
(248) 539-1330
morris@silvermanmorris.com

Attorneys for Plaintiff

OTTENWESS TAWEEL & SCHENK PLC
By: Thomas P. Bruetsch (P57473)
535 Griswold, Suite 850
Detroit, Michigan 48226
(313) 965-2121
TBruetsch@OttenwessLaw.com

LAW OFFICE OF JOHN M. KETZLER
PLLC
By: John M. Ketzler (P53044)
4237 North Atlantic Blvd.
Auburn Hills, Michigan 48326
(248) 920-0106
johnketzler@jketzlerlaw.com

Attorneys for Defendants

---

## DEFENDANT LXR BIOTECH LLC'S ANSWERS TO

## PLAINTIFF'S FIRST INTERROGATORIES

5. *State the basis for Defendants' affirmative defense that BEMO has failed to perform in accordance with the promissory notes and pre-incorporation agreement and identify any documents that support your answer as well as any individuals that have information on the subject.*

**ANSWER:**

BEMO is seeking to collect funds that are not due and owing.

LXR identifies Andrew Krause, Richard Kovach, Wade Dann, John VanOphem, Andrea Jones, John Lee, Adam Fovenesi (deceased), and William Gruits as individuals having information supporting its answer.

LXR identifies its General Ledger and Journal, the trial testimony in the case *Strategy & Execution Inc. v. LXR Biotech, LLC* and its membership interest schedules as supporting its answer.

6. *State the basis for Defendants' affirmative defense that BEMO has unclean hands and identify any documents that support your answer as well as any individuals that have information on the subject.*

**ANSWER:**

1. Defendant conspired with Thomas Morse in an attempt to take control of LXR Biotech LLC and/or force it into involuntary bankruptcy;

2. On information and belief, the true purpose of Plaintiff's loans to LXR Biotech was to allow Plaintiff to unlawfully repatriate funds from the country of Qatar to the United States without payment of taxes;

3. On information and belief, Plaintiff is not authorized to lend money for interest under the laws of Qatar.

LXR Biotech LLC identifies Andrew Krause, Thomas Morse, Wade Dann, Richard Kovach, Andrea Jones, John VanOphem, William Gruits Adam Fovenesi (deceased) and John Lee as individuals having information supporting its answer.

LXR identifies the trial testimony and trial exhibits in the case *Strategy & Execution Inc. v. LXR Biotech, LLC* as supporting its answer, along with the Qatar Civil Code.

7.    *Did Defendants ever pay on the promissory notes exhibited in BEMO's Complaint? If so, state every payment made and identity all documents exhibiting such payments. If not, state why.*

**ANSWER:**

LXR Biotech did not pay on the promissory notes attached to BEMO's complaint, for the reason that the loans converted to equity and no payment was owed.

8.    *Identify all individuals involved in the negotiations with BEMO in relation to the execution of the promissory notes. Include in your response all individuals that have information related to the negotiations, drafting, and/or execution of the promissory notes and a summary of the information such individual has.*

**ANSWER:**

| Person | Summary of information known |
|---|---|
| Andrew Krause | Negotiation and execution of the promissory notes, conversion of promissory notes to equity. |
| Adam Fovenesi | Conversion of promissory notes to equity. |
| John Lee | Execution of promissory notes. Conversion of promissory notes to equity. LXR Books and Records. |
| Richard Kovach | Negotiation and execution of the promissory notes, conversion of promissory notes to equity. BEMO Books and Records. |
| Wade Dann | Negotiation and execution of the promissory notes. Conversion of promissory notes to equity. |
| Andrea Jones | Execution of the promissory notes, conversion of promissory notes to equity. Books and Records of BEMO USA. |

9.    *Did BEMO's promissory notes convert into a membership or shareholder interest in the Defendants? If so, state why, and identify all documents Defendants drafted and/or executed evidencing such conversion.*

**ANSWER:**

Yes, the notes converted into a membership interest in LXR Biotech LLC because the parties agreed that they would convert. Documents evidencing such conversion include:

A. LXR Biotech LLC Journal and General Ledger;

B. Trial testimony in the case *Strategy & Execution Inc. v. LXR Biotech, LLC.*

10.    *State the purchase order amounts LXR BIOTECH, LLC had, by March 31, 2014, with CVS Pharmacy, Dollar Tree, Family Dollar, and Eurpac, respectively. State such amounts in measurements of units. Include in your answer identification of any documents exhibiting such purchase orders.*

**ANSWER:**

CVS Pharmacy:      ■

Dollar Tree:          ■

Family Dollar:       ■■■

Eurpac:                ■

LXR Biotech LLC identifies its "Sales by Item Detail" and "Sales by Customer Detail" reports as exhibiting this information.

11.    *State the purchase order amounts LXR BIOTECH, LLC had, by April 30, 2014, with Walmart, CVS Pharmacy, Dollar Tree, Family Dollar, and Eurpac, respectively. State such amounts in measurements of units. Include in your answer identification of any documents exhibiting such purchase orders.*

**ANSWER:**

Walmart:             ■■■

CVS Pharmacy:      ■

Dollar Tree:          ■■■

Family Dollar:       ■

# EXHIBIT 12

UNITED STATES OF AMERICA

IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEMO USA, WLL (QATAR),

    Plaintiff,

v.                                                                  Case No. 18-cv-10674

LXR BIOTECH, LLC, LXR                        Hon. Sean F. Cox
DISTRIBUTING, LLC, ETERNAL              Magistrate Judge Elizabeth A. Stafford
ENERGY, LLC, LXR BIOTECH
CORPORATION, LXR DISTRIBUTION
CORPORATION, ANDREW KRAUSE,
And JOHN AND JANE DOES,

    Defendants.

---

McDONALD TINKER PA                          OTTENWESS TAWEEL & SCHENK PLC
By:  Corey M. Adams, #27253             By:  Thomas P. Bruetsch (P57473)
300 W. Douglas, Suite 500                 535 Griswold, Suite 850
Wichita, KS  67202                             Detroit, Michigan  48226
(316) 263-5851                                   (313) 965-2121
cadams@mcdonaldtinker.com            TBruetsch@OttenwessLaw.com

SILVERMAN & MORRIS PLLC              LAW OFFICE OF JOHN M. KETZLER
By:  Thomas R. Morris (P39141)         PLLC
32300 Northwestern Highway, Suite 215   By:  John M. Ketzler (P53044)
Farmington Hills, MI  48334              4237 North Atlantic Blvd.
(248) 539-1330                                  Auburn Hills, Michigan  48326
morris@silvermanmorris.com             (248) 920-0106
                                                        johnketzler@jketzlerlaw.com
Attorneys for Plaintiff
                                                        Attorneys for Defendants

---

**FIRST DISCOVERY REQUESTS TO PLAINTIFF**

Defendants LXR BIOTECH, LLC, LXR DISTRIBUTING, LLC, LXR DISTRIBUTION CORPORATION, LXR BIOTECH CORPORATION, ETERNAL ENERGY LLC, and ANDREW KRAUSE serve the following requests for admission, requests for the production of documents, and interrogatories on Plaintiff:

## DISCOVERY REQUESTS

### INTERROGATORY 1:

Identify all persons who participated in responding to these discovery requests, all documents reviewed to assist in responding to these discovery requests, and all places or electronic systems reviewed or searched to assist in the answering of these discovery requests.

### ANSWER:


### REQUEST FOR ADMISSION 1:

Admit that Plaintiff is not authorized to loan money for interest under the laws of the nation of Qatar or any of its political subdivisions.

### ANSWER:


### REQUEST FOR DOCUMENTS 1:

Produce any and all documents (a) concerning Plaintiff's authorization or lack thereof to loan money for interest; and/or (b) related in any way to your response to interrogatory 1.

### ANSWER:

**REQUEST FOR ADMISSION 2:**

Admit that Plaintiff is not licensed as a financial institution by any governmental or public agency in the nation of Qatar, nor is Plaintiff licensed to loan money by any governmental or public agency of the nation of Qatar.

**ANSWER:**


**DOCUMENT REQUEST 2:**

Produce all licenses, authorizations, or other documents issued by any governmental or public agency in the nation of Qatar evidencing that Plaintiff is a licensed financial institution and/or is authorized to lend money.

**ANSWER:**


**REQUEST FOR ADMISSION 3:**

Admit that Wade Dann testified truthfully at trial on November 1, 2016 in the case of Strategy and Execution Inc v. LXR Biotech LLC.

**ANSWER:**


**DOCUMENT REQUEST 3:**

Produce all documents that support, refute, and/or relate in any way to your response to request for admission 3.

**ANSWER:**

# EXHIBIT 13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**BEMO USA, WLL (QATAR),**
                    **Plaintiff(s)**          **Case No. : 18-10974**

**v.**                                     **Hon. Sean F. Cox**

**LXR BIOTECH, LLC, et al.,**               **PARTIES ARE DIRECTED TO**
                    **Defendant(s)**          **PROVIDE A HARD COPY (ON ONE**
                                           **SIDE ONLY) OF ALL MOTIONS,**
                                           **RESPONSES, REPLIES AND EXHIBITS,**
                                           **TABBED, TO CHAMBERS**

_____/

## AMENDED SCHEDULING ORDER

This cause having come before the Court pursuant to Rule 16, Fed. R.Civ.P., the Court therefore enters the following schedule controlling the progress of this case:

**NOW THEREFORE, IT IS ORDERED that:**

**AMENDMENTS.** Amended Pleadings must be filed by: **SEPTEMBER 18, 2018**

**WITNESSES.** The deadline for identification of all witnesses who may testify at trial, including expert witnesses, is **JANUARY 14, 2019 (Expert disclosure must be accompanied by a written report of the expert as required by Fed. R. Civ. P. 26(a)(2), unless the parties stipulate otherwise, or by leave of Court.)**

**DISCOVERY.** All discovery shall be completed by: **FEBRUARY 14, 2019**
**DISCOVERY MOTIONS ARE DUE: 2 WEEKS PRIOR TO DISCOVERY CUTOFF**

**FACILITATION.** A status conference regarding facilitation will be held on: **FEBRUARY 25, 2019 at 2:00 P.M.**

**MOTIONS.** No motions may be filed after: **MARCH 15, 2019**

**\*\*\*SEE ATTACHED PRACTICE GUIDELINES BEFORE FILING ANY MOTION\*\*\*** If you fail to comply with those guidelines, the motion (or response) will not be considered as timely and will not be heard.

**FINAL PRETRIAL.** Final Pretrial is scheduled for: **JUNE 24, 2019 AT 3:00 P.M.**

A proposed <u>Joint</u> Pretrial Statement signed by counsel for all parties, shall be filed with the Court **one week prior** to the Final Pretrial Conference. The requirements of such a pretrial order are

attached.    *All requirements must be complied with.*

***Note:** Because the main focus of the **Final Pretrial Conference** will be on settlement, counsel must bring their **clients** and any persons with **full settlement authority up to Plaintiff's demand** with them to the conference and any **settlement conferences**.     If you have any questions concerning this matter, please call my Case Manager at (313) 234-2653.

**TRIAL** is scheduled for the months of:    <mark>**JULY/AUGUST 2019**</mark>

DATE: August 16, 2018                                    s/ SEAN F. COX_____
                                                                    UNITED STATES DISTRICT JUDGE
Copies to: **the attorneys of record**


*** **Motion Practice** ***

A.  Scheduling

1.  Motions to dismiss may be filed at any time. Motions for summary judgment should generally be filed following the close of discovery.

2.  After a motion is filed, the case manager will generally set a date for a hearing. The dates are firm and extensions will be granted only for good cause shown. Again, counsel desiring an extension should contact the case manager.

B.  Protective Orders

Protective orders shall not be entered routinely. In addition to the requirements under Local Rule 5.3, which are to be strictly followed, a protective order including a provision for filing a pleading, paper or exhibit, etc. under seal shall be subject to the following limitations: The entire pleading, paper, exhibit, etc. may not be filed under seal. Only the portion of the document(s) which are not to be publically disclosed may be filed under seal. In such instances, the portion to be filed under seal requires an endorsement by the Court on a cover page. A party's presentment to the Court for the endorsement shall be accompanied by an explanation why the portion of the document(s) is confidential.

C.  Briefing Guidelines

1.  **Requirements for All Motions.** The parties must provide the Court with a Judge's Copy of all motions and briefs filed in support of and in opposition to motions.   The parties must also provide the Court with a Judge's Copy of all exhibits filed in relation to a motion.   The Judge's Copy of Exhibits should also be indexed and tabbed.   In addition, on the Judge's Copy of the Exhibits the relevant parts of all exhibits, including deposition transcripts and cases, must be **highlighted.**   The two or three most relevant cases must be attached as exhibits.   Briefs must contain a table of contents and an index of authorities.

2.  **Motions for Summary Judgment.** Before filing or responding to motions for summary

# EXHIBIT 14

# UNITED STATES OF AMERICA

## IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEMO USA, WLL (QATAR),
   Plaintiff,

v.

LXR BIOTECH, LLC, LXR
DISTRIBUTING, LLC, ETERNAL
ENERGY, LLC, LXR BIOTECH
CORPORATION, LXR DISTRIBUTION
CORPORATION, ANDREW KRAUSE,
And JOHN AND JANE DOES,

   Defendants.

Case No. 18-cv-10674

Hon. Sean F. Cox
Magistrate Judge Elizabeth A. Stafford

---

McDONALD TINKER PA
By:  Corey M. Adams, #27253
300 W. Douglas, Suite 500
Wichita, KS  67202
(316) 263-5851
cadams@mcdonaldtinker.com

SILVERMAN & MORRIS PLLC
By:  Thomas R. Morris (P39141)
32300 Northwestern Highway, Suite 215
Farmington Hills, MI  48334
(248) 539-1330
morris@silvermanmorris.com

Attorneys for Plaintiff

OTTENWESS TAWEEL & SCHENK PLC
By:  Thomas P. Bruetsch (P57473)
535 Griswold, Suite 850
Detroit, Michigan  48226
(313) 965-2121
TBruetsch@OttenwessLaw.com

LAW OFFICE OF JOHN M. KETZLER
PLLC
By:  John M. Ketzler (P53044)
4237 North Atlantic Blvd.
Auburn Hills, Michigan  48326
(248) 920-0106
johnketzler@jketzlerlaw.com

Attorneys for Defendants

---

## [PROPOSED] AMENDED AFFIRMATIVE DEFENSES

Defendants plead the following affirmative defenses:

1. FAILURE TO STATE A CAUSE OF ACTION – Plaintiff has failed to state a cause of

action upon which relief may be granted and Defendants reserve the right to move for Summary

Judgment.

2.   DAMAGES - FAILURE TO MITIGATE - Defendants state that any damages suffered by Plaintiff as a result of the circumstances pled in Plaintiffs Complaint were a direct result of Plaintiffs failure to take a reasonable action to prevent said damages, and by such failure, Plaintiff has failed to mitigate its damages in this action.

3.   BREACH- Plaintiffs claims are barred from recovery as set forth in its Complaint by virtue of its failure to perform in accordance with the promissory notes and Pre Incorporation Agreement which includes but is not limited to failure of the contracts to comply with all laws, ordinances, and regulations.

4.   UNCLEAN HANDS -Plaintiffs claims are barred by the doctrine of unclean hands.

5.   LACK OF CONSIDERATION - Plaintiffs claims are barred by lack of consideration.

6.   CONDITION PRECEDENT- Plaintiffs claims are barred by the non-occurrence of a condition precedent.

7.   WAIVER AND ESTOPPEL – Plaintiff's claims are barred because terms of the agreements were waived and because it is estopped from denying prior statements made under oath concerning the conversion of promissory notes.

8.   ILLEGALITY, *ULTRA VIRES* CONDUCT, AND VOID UNDER PUBLIC POLICY – In Plaintiff's nation of incorporation, it is illegal to loan money for interest, and Plaintiff lacks the power and/or authority to do so.  Provisions in the agreements providing for the lending of money for interest are void.

Respectfully Submitted,

OTTENWESS, TAWEEL & SCHENK PLC

By:  /s/Thomas P. Bruetsch
Thomas P. Bruetsch (P57473)
535 Griswold, Suite 850
Detroit, Michigan  48226
(313) 965-2121
TBruetsch@OttenwessLaw.com

# EXHIBIT 15

Page 178

371 U.S. 178 (1962)

83 S.Ct. 227, 9 L.Ed.2d 222

<mark>Foman</mark>

<mark>v.</mark>

<mark>Davis</mark>

<mark>No. 41</mark>

<mark>United States Supreme Court</mark>

<mark>Dec. 3, 1962</mark>

Argued November 14, 1962

CERTIORARI TO THE UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

Milton Bordwin, Boston, Mass., for petitioner.

Roland E. Shaine, Boston, Mass., for respondent.

Syllabus

A Federal District Court dismissed petitioner's complaint in a civil action for failure to state a claim upon which relief might be granted. Petitioner promptly moved to vacate the judgment and amend the complaint so as to state an alternative theory for recovery. Before the Court ruled on those motions, petitioner filed notice of appeal from the judgment of dismissal. Subsequently, the District Court denied the motions to vacate the judgment and to amend the complaint, and petitioner filed notice of appeal from that denial. On appeal, the parties briefed and argued the merits of both the dismissal of the complaint and the denial of petitioner's motions. The Court of Appeals treated the first notice of appeal as premature, because of the then pending motion to vacate, and it dismissed that appeal. It held that the second notice of appeal was ineffective to review the judgment of dismissal, because it failed to specify that the appeal was from that judgment, and it affirmed denial of petitioner's motions, on the ground that there was nothing in the record to support a finding that the District Court had abused its discretion in refusing to allow amendment of the complaint.

*Held:*

1. On the record in this case, the Court of Appeals erred in narrowly reading the second notice of appeal as applying only to the denial of petitioner's motions, since petitioner's intention to seek review of both the dismissal of the complaint and the denial of her motions was manifest from the record as a whole. Pp. 181-182.

2. The Court of Appeals also erred in affirming the District Court's denial of petitioner's motion to vacate the judgment of dismissal in order to allow amendment of the complaint, since it appears from the record that the amendment would have done no more than state an alternative theory of recovery, Federal Rule of Civil Procedure 15(a) declares that leave to amend "shall be freely given when justice so requires," and denial of the motion without any apparent justifying reason was an abuse of discretion. P. 182.

292 F.2d 85 reversed.

Page 179

GOLDBERG, J., lead opinion

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

Petitioner filed a complaint in the District Court alleging that, in exchange for petitioner's promise to care for and support her mother, petitioner's father had agreed not to make a will, thereby assuring petitioner of an intestate share of the father's estate; it was further alleged that petitioner had fully performed her obligations under the oral agreement, but that, contrary thereto, the father had devised his property to respondent, his second wife and executrix. Petitioner sought recovery of what would have been her intestate share of the father's estate. Respondent moved to dismiss the complaint on the ground that the oral agreement was unenforceable under the applicable state statute of frauds. Accepting respondent's contention, the District Court entered judgment on December 19, 1960, dismissing petitioner's complaint for failure to state a claim upon which relief might be granted. On December 20, 1960, petitioner filed motions to vacate the judgment and to amend the complaint to assert a right of recovery in *quantum meruit* for performance of the obligations which were the consideration for the assertedly unenforceable oral contract. On January 17, 1961, petitioner filed a notice of

[83 S.Ct. 229] appeal from the judgment of December 19, 1960. On January 23, 1961, the District Court denied petitioner's motions to vacate the judgment and to amend the complaint. On January 26, appeal from denial of the motions.

On appeal, the parties briefed and argued the merits of

dismissal of the complaint and denial of petitioner's

**Page 180**

 motions by the District Court. Notwithstanding, the Court of Appeals, of its own accord, dismissed the appeal insofar as taken from the District Court judgment of December 19, 1960, and affirmed the orders of the District Court entered January 23, 1961. 292 F.2d 85. This Court granted certiorari. 368 U.S. 951.

 The Court of Appeals reasoned that, in the absence of a specific designation of the provision of the Federal Rules of Civil Procedure under which the December 20, 1960, motion to vacate was filed, the motion would be treated as filed pursuant to Rule 59(e), rather than under Rule 60(b);[1] since, under Rule 73 (a),[2] a motion under Rule 59 suspends the running of time within which an appeal may be perfected, the first notice of appeal was treated as premature in view of the then pending motion to vacate, and of no effect. The Court of Appeals held the second notice of appeal, filed January 26, 1961, ineffective to review the December 19, 1960, judgment dismissing the complaint because the notice failed to specify that the appeal was being taken from that judgment as well

**Page 181**

 from the orders denying the motions. Considering the second notice of appeal, therefore, only as an appeal from the denial by the District Court of the motions to vacate and amend, the Court of Appeals held that there was nothing in the record to show the circumstances which were before the District Court for consideration in ruling on those motions; consequently, it regarded itself as precluded from finding any abuse of discretion in the refusal of the court below to allow amendment.

 The Court of Appeals' treatment of the motion to vacate as one under Rule 59(e) was permissible at least as an original matter, and we will accept that characterization here. Even if this made the first notice of appeal premature, we must nonetheless reverse, for we believe the Court of Appeals to have been in error in so narrowly reading the second notice.

 The defect in the second notice of appeal did not mislead or prejudice the respondent. With both notices of appeal before it (even granting the asserted ineffectiveness of the first), the Court of Appeals should have treated the appeal from the denial of the motions as an effective, although inept, attempt to appeal from the judgment sought to be vacated. Taking the two notices and the appeal papers together, petitioner's intention to seek review of both the dismissal and the denial of the motions was manifest. Not only did both parties brief and argue the merits of the earlier judgment on appeal, but petitioner's statement of points on

**[83 S.Ct. 230]** which she intended to rely on appeal, submitted to both respondent and the court pursuant to rule, similarly demonstrated the intent to challenge the dismissal.

 It is too late in the day, and entirely contrary to the spirit of the Federal Rules of Civil Procedure, for decisions on the merits to be avoided on the basis of such mere technicalities.

 The Federal Rules reject the approach that pleading is a game of skill in which one misstep by

**Page 182**

 counsel may be decisive to the outcome, and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

*Conley v. Gibson*, 355 U.S. 41, 48. The Rules themselves provide that they are to be construed "to secure the just, speedy, and inexpensive determination of every action." Rule 1.

 The Court of Appeals also erred in affirming the District Court's denial of petitioner's motion to vacate the judgment in order to allow amendment of the complaint. As appears from the record, the amendment would have done no more than state an alternative theory for recovery.

 Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. *See generally,* 3 Moore, Federal Practice (2d ed. 1948), ¶¶ 15.08, 15.10. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

 The judgment is reversed, and the cause is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

 HARLAN, J., memorandum

Separate memorandum of MR. JUSTICE HARLAN, in which MR. JUSTICE WHITE joins.

I agree with the Court as to the dismissal of petitioner's appeal by the Court of Appeals. However, as to her motion to vacate the order of the District Court and for leave to amend the complaint, I believe such matters are best left with the Courts of Appeals, and I would dismiss the writ of certiorari, in that respect, as improvidently granted.

---------

Notes:

[1] Rule 59(e) provides:

A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.

Rule 60(b) provides in relevant part:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect . . . or (6) any other reason justifying relief from the operation of the judgment. . . . A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. . . .

[2] Rule 73(a) provides in relevant part:

The running of the time for appeal is terminated by a timely motion made pursuant to any of the rules hereinafter enumerated, and the full time for appeal fixed in this subdivision commences to run, and is to be computed from the entry of any of the following orders made upon a timely motion under such rules . . . granting or denying a motion under Rule 59 to alter or amend the judgment. . . .

---------

# EXHIBIT 16

Page 452

259 F.3d 452 (6th Cir. 2001)

Johnnie Wade, Plaintiff-Appellant,

v.

Knoxville Utilities Board, Defendant-Appellee.

No. 00-5210

United States Court of Appeals, Sixth Circuit

July 30, 2001

Argued: June 6, 2001

Page 453

[Copyrighted Material Omitted]

Page 454

George T. Underwood, Jr., THE LAW OFFICE OF GEORGE T. UNDERWOOD, Knoxville, Tennessee, for Appellant.

Edward G. Phillips, Adrienne L. Anderson, KRAMER, RAYSON, LEAKE, RODGERS & MORGAN, Knoxville, Tennessee, for Appellee.

Page 455

Before: GUY, BOGGS, and GILMAN, Circuit Judges.

OPINION

RALPH B. GUY, JR., Circuit Judge.

Plaintiff, Johnnie Wade, appeals from the entry of summary judgment in favor of his former employer, the Knoxville Utilities Board (KUB), on his claims of racial discrimination and retaliation in violation of 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e; and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101. Plaintiff also contends that the district court abused its discretion by denying his motion to amend the complaint to add new claims for disability discrimination, race discrimination, and retaliatory discharge. After careful review of the record and the arguments presented on appeal, we find no error and affirm.

I.

Plaintiff, an African-American male, was hired into KUB's four-year lineman apprentice program in October 1990. Although he was promoted to a second-year apprentice position, plaintiff and several others were notified in October 1992 that they would not be promoted to a third-year position because of poor attendance and other problems. In January 1993, plaintiff injured an ankle when he was hit with an electric cart driven by another employee. Although defendant's investigation was unable to substantiate the claim, plaintiff believed that the accident was intentional and racially motivated.

Upon his return to work in April 1993, plaintiff exhibited behavior that caused KUB to be concerned about his mental condition. Plaintiff was referred to Dr. Jeff Greenwood, a psychiatrist, for counseling. Dr. Greenwood diagnosed plaintiff as suffering from paranoia, treated him with anti-psychotic medication, and excused him from work. On April 19, 1993, plaintiff filed the first of three charges with the EEOC. This charge alleged race discrimination and harassment during his employment, including incidents of racially offensive language and fliers, derogatory comments and pranks, and the denial of training and promotions.

After being released to work by Dr. Greenwood, plaintiff returned to KUB on May 4, 1993. Plaintiff's behavior that day and the next concerned his supervisor and led to a leave of absence to continue treatment. In June 1993, Dr. Greenwood reported that plaintiff had responded to medication and could return to work as a lineman apprentice. He also indicated that plaintiff was taking 10 mg. of Stelazine at bedtime, which "may have some subtle sedative side effects," but that plaintiff had "no apparent impairment from his medication and may work in his former sensitive job on high power lines."

KUB requested a fitness-for-duty evaluation. Dr. Kenneth Carpenter, a board-certified psychiatrist, diagnosed plaintiff as having Schizophreniform Disorder and Paranoid Personality. He observed that plaintiff had difficulty with thinking and concentration, as well as continued feelings of persecution, and recommended that he be placed on a different work crew in a less safety-sensitive position for six months. Plaintiff, who was represented by counsel at the time, asked for a third opinion. The third doctor concluded that plaintiff should not work with high voltage while taking the medication. Plaintiff was offered other work in the Properties Department, which he viewed as a demotion and refused.

In November 1993, Dr. Greenwood removed plaintiff from the medication and released him to work. Plaintiff returned

**Page 456**

to work as a second-year lineman apprentice and was promoted to a third-year position in February 1994. Over the next several months, however, Bill Norton, the manager of the program, received verbal reports of several near accidents that were attributed to plaintiff's mental lapses or inattention.

In July 1994, Norton consulted with Dr. Carpenter about plaintiff, who concluded that plaintiff should not remain in the lineman program but could handle a less safety-sensitive position in the meter tester apprentice program. Plaintiff was offered a transfer to a meter tester position, in the final year of the three-year program, with no loss of pay. To accomplish the transfer without bidding the position, the transfer was specifically requested and granted as an accommodation under the Americans with Disabilities Act (ADA). In September 1994, the EEOC issued its determination that there was no evidence of discrimination. Notably, this determination concerned plaintiff's claims up to and including the transfer to the meter tester program. Plaintiff, however, did not file suit within 90 days.

Plaintiff worked in the meter tester apprentice program until March 27, 1995. On that day, plaintiff was asked to meet with Everett Noe, Manager of the Electric Meter Department, and Dennis Upton, Human Resources Manager, concerning complaints from several female coworkers that plaintiff's interactions made them feel uncomfortable. KUB considered the meeting to be a counseling session, not a disciplinary action, as no formal complaint had been filed. Plaintiff became agitated, demanded to know who had complained, and denied that he had harassed anyone. Plaintiff says Upton told him to "sit down and shut his damn mouth," while Upton claims he said he could not reveal the names because "it's the damn law." [1]

Shortly after the meeting ended, plaintiff met Noe and Upton in the hallway and called Upton an "Uncle Tom." Upton, who is also African-American, called plaintiff back into his office, accused him of being insubordinate and, when plaintiff would not apologize, suspended plaintiff with pay for the rest of the day. When they spoke by telephone later in the day, plaintiff refused to apologize. The next day, March 28, 1995, plaintiff was seen in the emergency room of a local hospital. According to Dr. Greenwood, plaintiff was psychotic and refused medication. As a result, plaintiff was involuntarily committed to a psychiatric hospital for treatment.

On June 4, 1995, plaintiff filed his second EEOC charge, alleging that he was falsely accused of sexual harassment in retaliation for filing the first EEOC charge. Several weeks later, plaintiff was approved by KUB to receive long-term

disability benefits. Dr. Greenwood reported to KUB that plaintiff had schizophrenia with progressive decline and appeared to be permanently disabled. In October 1995, Dr. Greenwood indicated that plaintiff should apply for social security benefits. The district court noted that plaintiff was receiving social security benefits for his mental condition.

Plaintiff had no further contact with KUB until December 1996, when he asked to return to work. He presented a letter from Dr. Greenwood dated December 18, 1996, which stated: "From his appearance today [plaintiff] seems able to return to work at some capacity, though his illness has been recurrent and may require future

**Page 457**

periods of absence when symptoms might recur." However, a handwritten note at the bottom of the letter written by another doctor said that Dr. Greenwood had released plaintiff to return to his former job with no restrictions. Dr. Greenwood testified that the handwritten note, made by another doctor who had not treated plaintiff, did not comport with his opinion at the time.

KUB responded to plaintiff's request in a letter dated December 30, 1996, which outlined several conditions that would have to be met before plaintiff could return to work. The conditions included: (1) that plaintiff submit to a fitness-for-duty psychological examination by Dr. Carpenter; (2) that KUB complete its review of allegations of possible criminal conduct by plaintiff; (3) that plaintiff agree to complete additional course work that had been added to the meter tester program during his absence; and (4) that, if the other conditions were met, plaintiff meet with Upton to discuss disciplinary action for his conduct on March 27, 1995. [2]

Dr. Carpenter conducted a fitness-for-duty evaluation in January 1997 and concluded that plaintiff should not be returned to the ongoing stress of a work environment. He observed that plaintiff was not taking his medication and opined that there was a "great likelihood that Mr. Wade will have more striking irrational behavior as time goes on." Dr. Carpenter also indicated that plaintiff's "extreme guardedness and vague thinking make him difficult to work with" and that, "with the stress back on the job, his symptoms will intensify and there will be further problems." Dr. Greenwood testified that he did not disagree with any of the conclusions in Dr. Carpenter's report. [3]

Based principally on Dr. Carpenter's report, KUB decided not to have plaintiff return to work. On February 26, 1997, KUB representatives advised plaintiff and his attorney that plaintiff could not return to work, but would remain on inactive status until he was no longer eligible for long-term disability benefits. Plaintiff was also advised that his

employment would be terminated as of June 30, 1997. Although KUB scheduled a due process pre-termination hearing, neither plaintiff nor his attorney attended. KUB prepared a notice of termination and cover letter dated April 11, 1997, but was unable to serve plaintiff personally. Plaintiff agreed to meet with Upton and Noe on April 15, 1997, but before they could give him the papers, plaintiff fell from the chair to the floor and claimed to have injured his back. Plaintiff filed a worker's compensation claim for the fall, which KUB contested. [4] On April 11,

**Page 458**

1997, the EEOC issued a right-to-sue letter on plaintiff's second EEOC charge, but plaintiff did not file suit within 90 days.

Plaintiff also claims that KUB sabotaged an offer of employment he received from Boeing, and that KUB did so in retaliation for his having filed complaints with the EEOC. Plaintiff received a contingent offer of employment from Boeing on June 23, 1997. After someone at Boeing contacted KUB for a reference check, the offer was withdrawn. Noe testified that someone from Boeing called him in July 1997 to ask about plaintiff's employment. Noe said plaintiff no longer worked at KUB. When asked why, Noe said plaintiff had been out of work for a great length of time, and they decided not to bring him back. Boeing withdrew the offer based in part on information received during its reference check, but indicated a willingness to reconsider if plaintiff could verify that his separation was voluntary and not for cause.

On August 14, 1997, plaintiff filed his third complaint with the EEOC, charging that he was harassed and discharged because of disability and race, and that he was retaliated against for filing EEOC charges. On March 5, 1998, the EEOC issued a right-to-sue letter. Plaintiff commenced this action on June 2, 1998, within the 90-day limitations period. The complaint alleged that KUB engaged in a pattern and practice of racial discrimination, maintained a racially hostile work environment, and retaliated against plaintiff for filing complaints of discrimination with the EEOC.

On November 23, 1999, about three weeks before the dispositive motion cut-off date, plaintiff filed a motion to amend the complaint to add claims for disability discrimination pursuant to the ADA, see 42 U.S.C. § 12101; Section 504 of the Rehabilitation Act of 1973, see 29 U.S.C. § 794; and the Tennessee Handicap Act (THA), see Tenn. Code Ann. § 8-50-103. The proposed amended complaint alleged new claims of race discrimination under Title VI of the Civil Rights Act of 1964, see 42 U.S.C. § 2000d, and retaliatory discharge under the whistleblower provisions of the Tennessee Public Protection Act (TPPA),

see Tenn. Code Ann. § 50-1-304. Plaintiff also filed a motion for partial summary judgment in his favor on the ADA claims, while defendant filed a motion for summary judgment on the race and retaliation claims asserted in the original complaint.

On January 18, 2000, the district court denied plaintiff's motion to amend the complaint. As a result, plaintiff's motion for partial summary judgment was also denied. The district court then granted defendant's motion for summary judgment for the reasons set forth in its opinion filed January31, 2000. This timely appeal followed.

II.

A.Motion to Amend

Under Fed. R. Civ. P. 15(a), leave to amend a pleading shall be freely given "when justice so requires." Several factors should be considered in determining whether to grant a motion to amend.

Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are

**Page 459**

critical factors in determining whether an amendment should be granted.

Head v. Jellico Hous. Auth., 870 F.2d 1117, 1123 (6th Cir. 1989) (quoting Hageman v. Signal L.P. Gas, Inc., 486 F.2d 479, 484 (6th Cir. 1973)). See also Coe v. Bell, 161 F.3d 320, 341-42 (6th Cir. 1998), cert. denied, 528 U.S. 842 (1999). When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier. See Duggins v. Steak 'N Shake, Inc., 195 F.3d 828, 834 (6th Cir. 1999). The denial of a motion for leave to amend is reviewed for abuse of discretion, except to the extent that the decision is based on a legal conclusion that the amendment would not withstand a motion to dismiss. See Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 306 (6th Cir. 2000),cert. denied, __ U.S. __ 121 S.Ct. 2594, 150L.Ed.2d 752 (2001); Martin v. Associated Truck Lines, Inc., 801 F.2d 246, 248 (6th Cir. 1986).

The district court considered the appropriate factors and gave its reasons for denying the motion to amend. Plaintiff offered no explanation or justification for having waited a year and a half before filing the motion to amend to add the disability discrimination claims, the retaliatory discharge

claim under the TPPA, or the claim of race discrimination facilitated by federal funds in violation of Title VI. Since the third EEOC charge complained of disability discrimination as well as race discrimination and retaliation, plaintiff was aware of his claims for disability discrimination. Nonetheless, the complaint, which was filed with the assistance of counsel and signed by plaintiff personally, did not claim adverse treatment because of disability. The complaint did not put defendant on notice that it would have to defend claims of discrimination based on disability, and discovery was conducted accordingly.

Recognizing that delay alone was not sufficient reason to deny the amendment, the district court also found that

to allow the amendments proposed by plaintiff would result in significant prejudice to the defendant. The dispositive motion deadline has already past, and defendant has filed a motion for summary judgment on all claims alleged in the original complaint. It is also apparent that significant discovery has been completed including more than 20 depositions. Obviously, some if not all of the depositions already taken would have to be supplemented to address the multiple issues raised in the proposed amendments and other extensive and additional discovery would have to be undertaken as well. In addition, defendant would have to prepare a defense for the newly asserted claims that likely would require securing new medical and expert witnesses.

Plaintiff argues that he should have been permitted to add the disability discrimination claims because they would relate back to the filing of the original complaint. See Spillman v. Carter, 918 F.Supp. 336 (D. Kan. 1996). The district court did not disagree. Rather, in the exercise of its discretion, the court determined that justice did not require that leave be granted on the disability claims. We find no abuse of discretion in this regard. Even on appeal, plaintiff fails to offer any explanation or justification for the lateness of the motion to amend. Nor does plaintiff dispute the finding of prejudice to the defendant that would result if plaintiff had been allowed to add the disability discrimination claims at that stage of the proceedings.

The district court also concluded that the amendment would be futile with respect

## Page 460

to the TPPA and Title VI claims because they would be barred by the applicable statutes of limitations. The retaliatory discharge claim under the TPPA is governed by a one-year statute of limitations and accrues when the plaintiff knew or should have known that an injury had been sustained. See Weber v. Moses, 938 S.W.2d 387, 393 (Tenn. 1996). The period commenced when plaintiff "received unequivocal oral notice" of the decision to terminate his employment. Id. at 388. In this case, plaintiff was advised of KUB's decision in February 1997 and was served with written notice of termination in April 1997. Thus, even if the claim related back to the filing of the original complaint, it accrued more than a year before the original complaint was filed.

Similarly, the race discrimination claim under Title VI is governed by the one-year limitations period set forth in Tenn. Code Ann. § 28-3-104(a)(3) for civil actions brought under federal civil rights statutes. See Simmons v. Middle Tenn. State Univ., No. 95-6111, 1997 WL 400105, at *2-3 (6th Cir. Jul. 11, 1997) (unpublished decision). Since plaintiff was not required to exhaust administrative remedies before bringing a Title VI claim, the limitations period was not tolled during the pendency of the administrative proceedings. Id. See also Del. State Coll. v. Ricks, 449 U.S. 250, 261 (1980). Even under the de novo review required with respect to a finding of futility, plaintiff has failed to demonstrate any error by the district court with respect to these claims.

### B. Motion for Summary Judgment

We review de novo the district court's grant of summary judgment. See, e.g., Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 (1986).

### 1. Timeliness of Title VII Claims

Although plaintiff alleged race discrimination and retaliation claims reaching back to the start of his employment with KUB, the district court found that Title VII claims arising more than 300 days before plaintiff's filing of the third EEOC charge on August 14, 1997, were time barred. Claims based on earlier conduct were barred because plaintiff failed to file an action within 90 days after receiving either the first or the second right-to-sue letter. The first EEOC determination addressed plaintiff's claims of racial harassment, the initial failure to promote him to a third-year lineman apprentice position, and the later ADA-transfer into the meter tester apprentice program. The second right-to-sue letter pertained to plaintiff's charges of retaliation. Since plaintiff was on disability leave beginning in late March 1995, he cannot claim he was subjected to a hostile work environment during the relevant time period. Thus, all plaintiff's race and retaliation claims were time barred, except for claims based on KUB's decision to terminate plaintiff's employment and the post-termination

response to Boeing's reference check.

Plaintiff sought to resurrect the earlier claims under a continuing violation theory, which the district court properly rejected. As we have explained, the continuing violation doctrine may serve to toll the statutory period within which to file a complaint with the EEOC. See United Air

**Page 461**

Lines, Inc. v. Evans, 431 U.S. 553 (1977); Dixon v. Anderson, 928 F.2d 212, 216-17 (6th Cir. 1991). The continuing violation doctrine, however, does not relieve a plaintiff of the need to file an action within 90 days of receiving the right-to-sue letter. See Clark v. Nissan Motor Mfg. Corp. U.S.A., No. 97-5956, 1998 WL 786892, at *5 (6th Cir. Oct. 26, 1998) (unpublished decision) (citing Brown v. Hartshorne Pub. Sch. Dist. No. 1, 926 F.2d 959, 962 (10th Cir. 1991)). Plaintiff has abandoned the continuing violation argument on appeal.

The district court nonetheless recognized that the 90-day filing requirement is not jurisdictional and may be subject to equitable tolling in exceptional circumstances. See Truitt v. County of Wayne, 148 F.3d 644, 646-47 (6th Cir. 1998). After considering the relevant factors, the district court concluded that equitable tolling would not be appropriate in this case. Plaintiff does not challenge this finding on appeal. Instead, plaintiff amplifies a tolling argument raised by counsel during the hearing on defendant's motion for summary judgment.

Plaintiff argues that the time for filing suit after his receipt of the second right-to-sue letter in April 1997 should be tolled because he was on disability leave from March 1995 until his discharge. This, plaintiff contends, raises at least a question of fact under Tenn. Code Ann. § 28-1-106, which serves to toll the statute of limitations when a person entitled to commence an action is "of unsound mind" at the time the cause of action accrued. This tolling provision has no application to the Title VII claims, however, as we have held that state law tolling or savings provisions do not apply to the limitations periods expressly set forth in Title VII. See Clark, 1998 WL 786892, at *3 (citing Johnson v. Ry. Express Agency, Inc., 489 F.2d 525, 530 (6th Cir. 1973) (rejecting application of Tennessee savings statute to 90-day period under Title VII)). [5]

2.Title VII Race and Retaliation Claims

To establish a prima facie case of race discrimination, plaintiff must show that he (1) was a member of a protected class, (2) was qualified for the position, (3) was discharged, and (4) was replaced by a person outside the protected group. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

506 (1993). Once a prima facie showing is made, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for its decision. The ultimate burden of persuasion rests with plaintiff to prove that the proffered reasons were a pretext for discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000); Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

**Page 462**

The district court found that plaintiff had not made a prima facie showing of race discrimination because he was not qualified to return to work as a meter tester apprentice. When plaintiff asked to return to work in December 1996, he had been on disability leave for about 20 months. Accepting the genuineness of plaintiff's request, KUB required that certain conditions be met before he could return to work. The first and foremost of these conditions was that plaintiff be evaluated by Dr. Carpenter, who concluded that plaintiff should not be returned to the ongoing stress of a work environment. Plaintiff makes much of the fact that a jury found against Dr. Carpenter in an unrelated malpractice action arising out of an evaluation performed on behalf of an employer. As the district court correctly observed, that fact has no bearing in this case. This is particularly true since Dr. Greenwood did not disagree with Dr. Carpenter's conclusions, and no contrary opinions were offered concerning plaintiff's ability to return to work.

Plaintiff argues that he was qualified to work in the meter tester program because KUB had placed him there in July 1994, and he had performed satisfactorily until going on leave in March 1995. The district court addressed this argument and distinguished between plaintiff's skill and his ability to function on the job.

Wade argues that KUB transferred Wade to the meter testing program so it cannot argue he is not qualified. Wade also points to the testimony of Don Blevins ("Blevins") who was his supervisor in the meter testing apprentice program as support for his contention that he was qualified for the job. Blevins testified that he never had a problem with Wade and that Wade was able to perform the work testing the meters and was making good progress. However, Blevins' experience working with Wade was prior to Wade's involuntar[y] commitment to a psychiatric hospital and almost two years of disability leave for paranoid schizophrenia. It was also prior to the fitness for work examination by Dr. Carpenter. Blevins' experience with Wade and his evaluation of Wade's performance prior to these significant events has no bearing on the issue of Wade's status and ability to perform in December 1996. Under these circumstances, whether Wade is "qualified" for the meter testing apprentice position is not a question of

skill but the ability to function on the job by performing the work and dealing with the stress, coworker interaction, and supervision attendant to the job.

It is clear that Dr. Greenwood's letter in December 1996 stating that plaintiff could return to work "at some capacity" represents a somewhat inconsistent position from the opinions he expressed while Wade was on disability leave. KUB was justified based on all the circumstances and its own work policy to require Wade to undergo a fitness for work examination.

Plaintiff offered no evidence to contradict the opinion of Dr. Carpenter, nor did plaintiff offer other evidence "to show that he would be able to handle the stress of returning to work, dealing with coworkers, and accepting supervision and constructive criticism." The district court concluded that, "[c]onsidering all of the facts and circumstances, this evidence demonstrates that Wade could not perform the essential functions of the meter testing apprentice position and could not meet the reasonable expectations KUB would have for a person in that position." See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 939 (6th Cir. 1999). Reviewing the question de novo, we agree that plaintiff failed to make a

**Page 463**

prima facie showing that he was discharged or not returned to work because of race discrimination. [6]

Next, to demonstrate a prima facie case of retaliation, plaintiff must show that (1) he was engaged in activity protected by Title VII, (2) the activity was known to the defendant, (3) he was subjected to tangible employment action, and (4) there is a causal link between the protected activity and the adverse employment action. See Johnson v. Dep't of Health and Human Servs., 30 F.3d 45, 47 (6th Cir. 1994). The evidence must be sufficient to raise an inference that the protected activity was the likely reason for the adverse action. See Walborn v. Erie County Care Facility, 150 F.3d 584, 589 (6th Cir. 1998).

With respect to the decision to terminate plaintiff's employment, the district court correctly concluded that plaintiff had not shown a causal connection between the termination and the prior EEOC charges. The district court explained:

There is no direct evidence in the record or evidence to raise an inference that Wade's termination in February 1997 was connected with the EEOC charges he filed in 1993 and 1995. Subsequent to filing the first charge, Wade was advanced to the third year lineman apprentice position and later was given an accommodation by being transferred to the meter testing program. The number of years between the

first two EEOC charges and the discharge in February 1997 militate against a finding that the discharge was retaliatory in nature. See, e.g., Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., a Div. of RKO Bottlers of Toledo, Inc., 783 F.2d 50 (6th Cir. 1986) (a time span of more than one year from the filing suit to the firing militated against finding that discharge was retaliatory). Much of Wade's response to the motion is comprised of conclusory allegations and his perceptions which are not sufficient to stave off summary judgment. Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 871 (1st Cir. 1997). Wade's subjective assessment is not evidence. Id.

The district court's decision is also supported by evidence that plaintiff was approved for long-term disability benefits shortly after he filed the second EEOC charge in June 1995. In addition, those benefits were not terminated after the second right-to-sue letter was issued in April 1997.

Plaintiff emphasizes that the letter accompanying KUB's formal notice of termination was written on the same date that the EEOC issued the second right-to-sue letter. It is undisputed, however, that KUB made the decision to terminate plaintiff's employment before the right-to-sue letter was issued. The other evidence of retaliatory intent that plaintiff points to is the statement from Upton on March 27, 1995, to the effect that plaintiff's refusal to apologize for the "Uncle Tom" comment would "have consequences." Since Upton viewed the comment as insubordination, it is not surprising that he might threaten disciplinary action. Nonetheless, consequences were threatened in March 1995, before plaintiff filed the second EEOC

**Page 464**

charge in June 1995. While the question of possible disciplinary action for that statement was included as the last of the conditions required before plaintiff could return to work, that does not suggest a connection between the filing of EEOC charges and the decision not to permit plaintiff to return to work.

Finally, plaintiff alleges that his conditional offer of employment from Boeing was sabotaged by defendant in retaliation for having engaged in protected activity. We agree with the district court that there was no causal connection shown between the prior EEOC charges and Noe's response to the inquiry from Boeing. [7]

3. THRA and § 1981 Claims

The district court also granted summary judgment to defendant on plaintiff's claims of race discrimination and retaliation brought under the THRA and § 1981. First, as the district court observed, these claims are governed by the

same burden-shifting standards as the claims under Title VII. See Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992);Raines v. Shoney's, Inc., 909 F.Supp. 1070 (E.D. Tenn. 1995); Bruce v. W. Auto Supply Co., 669 S.W.2d 95 (Tenn. Ct. App. 1984). As a result, the analysis and conclusions concerning the Title VII claims discussed above apply equally to the parallel claims brought under the THRA and §1981.

Moreover, plaintiff's THRA and § 1981 claims were time barred. Claims brought under the THRA are subject to the one-year limitations period set forth in Tenn. Code Ann. § 4-21-311. See Weber, 938 S.W.2d at 389-90. Because § 1981 does not specify a statute of limitations, we apply the one-year limitations period from Tenn. Code Ann. § 28-3-104. See Jackson v. Richards Med. Co., 961 F.2d 575, 578 (6th Cir. 1992). Since neither period is tolled by the filing of the administrative claims with the EEOC, these claims accrued more than one year before the complaint was filed on June 2, 1998.

AFFIRMED.

-------------------

Notes:

[1]Plaintiff argues that these false accusations were made because of race and retaliation in order to prevent him from completing the meter tester apprentice program and achieving civil service protection.

[2]The investigation into allegations of criminal activity was prompted by an alert from the TVA Employees Credit Union that plaintiff might be involved in a credit-card scam. KUB had a private investigator look into the allegation, but the evidence was inconclusive. On appeal, plaintiff argues that KUB unfairly investigated allegations of criminal activity on his part and included as a condition for his return to work that KUB complete its review of those allegations. The evidence submitted in this regard does not show or permit an inference that KUB unjustly or inappropriately looked into the conduct that was brought to its attention by the credit union. Nor was there evidence to suggest that the investigation was related to or the cause of plaintiff's discharge.

[3]Plaintiff contends that KUB violated its own policy by failing to obtain a third opinion concerning his ability to return to work. The language plaintiff relies on, however, pertains to the determination of eligibility for long-term disability benefits and not fitness to return to work.

[4]In 1999, based on information pertaining to the worker's compensation claim, KUB had a private investigator check whether plaintiff was playing on a basketball team despite his claimed back injury. Plaintiff asserts that this was

evidence of continued harassment.

[5]Moreover, under Tennessee law, the plaintiff bears the burden of proving the injured party was of unsound mind during the entire time in question. See Parham v. Walker, 568 S.W.2d 622, 624 (Tenn. Ct. App. 1978). To be of "unsound mind," Tennessee law requires that one be incapable of attending to any business or taking care of himself. See Smith v. Grumman-Olsen Corp., 913 F.Supp. 1077, 1085 (E.D. Tenn. 1995). The first right-to-sue letter, which was issued in September 1994, preceded the plaintiff's disability. The second letter, issued in April 1997, was followed by plaintiff's application for employment with Boeing and the filing of the third EEOC charge in August 1997. While defendant did not dispute plaintiff was disabled from work, the psychiatric evaluations did not suggest that plaintiff's mental condition rendered him unable to attend to any business or take care of himself. Plaintiff offered no other evidence on this issue.

[6]Taking the matter to the next step, the district court also found that plaintiff failed to raise a jury-submissible issue on the question of whether the defendant's reasons were merely pretext for race discrimination. See Manzer, 29 F.3d at 1084. Without repeating the district court's reasoning, we agree that plaintiff failed to present evidence to suggest that the defendant's reasons (1) lacked a factual basis, (2) did not actually motivate the decision, or (3) were insufficient to motivate the decision.

[7]Beyond this conclusion, the district court also observed that: "Wade signed a release regarding Boeing's acquisition of information in connection with his employment application which holds former employers harmless except for misrepresentation"; "Wade provided less than truthful information on the application concerning his mental condition and use of prescribed medications"; and, "Boeing could have withdrawn its conditional job offer for several reasons unrelated to any statements by KUB."

-----------------